JAMES B. MARTIN et al., as Trustees of the Joint Welfare Fund and of the Joint Pension Fund of the International Union of Operating Engineers, Local Unions 14, 14B, 15, 15A, 15C, AFL–CIO, et al., Appellants, *v.* WILLIAM CASEY & SONS, INC., Defendant, and MARYLAND CASUALTY COMPANY et al., Respondents.

First Department, February 4, 1958.

*William J. Corcoran* of counsel (*Levy, Galotta & Corcoran,* attorneys), for appellants.

*Emil V. Pilz* of counsel (*Leslie A. Hynes* and *Thomas B. Treacy* with him on the brief; *Nevius, Jarvis & Pilz,* attorneys), for respondents.

BREITEL, J.  The issue in this case is whether a contractor's payment bond securing the payment of wages and compensation of workmen includes in its protective coverage contributions due from the employer to union welfare funds.  The funds provide benefits for such workmen from contributions made pursuant to the industry collective bargaining agreement. A subsidiary question is whether the trustees of the union welfare funds are the proper parties entitled to sue on such bond to recover unpaid employer contributions.

Plaintiffs are trustees of the union welfare funds.  Defendants, on this appeal, are the compensated sureties on the payment bond supplied by the contractor-employer who defaulted in making the required contributions to the union welfare funds. Special Term granted summary judgment in favor of the sureties on the ground that the welfare fund contributions were neither wages nor compensation.

The order should be reversed, defendants' cross-motion denied, and plaintiffs' motion for summary judgment granted. For the reasons stated below the payment bond includes in its protection welfare fund contributions, and the fund trustees are proper parties entitled to sue therefor.

Defendant William Casey & Sons, Inc., not a party to this appeal, was a general contractor for the City of New York.  In connection with its contract, and as required by the city, Casey supplied the payment bond in suit.  The bond expressly provided that it was not affected by any requirement of law, or absence of such requirement, that the city obtain such a bond. Hence, as urged by the sureties, this was a '' common-law '' bond, rather than a statutory obligation.  Casey proceeded with its performance under the contract with the city, but it defaulted before completion.  Upon default it owed its workmen wages, and it was also in default in the payment of contributions directly payable to the union welfare fund.  The sureties have paid the wages directly due to the workmen, but have refused to pay the defaulted contributions.  In consequence the fund trustees have brought this action to recover such contributions.

The bond provides that the principal and sureties undertake to pay promptly all lawful claims for '' Wages and compensation for labor performed and services rendered by all persons

engaged in the prosecution of the Work under said Contract ''.
The collective bargaining agreement, under which the workmen
were employed and paid on the job, provided both for the rate
of wages and for welfare fund contributions, but these were
treated separately in separate articles of the collective agree-
ment. The wages were the customary direct compensation
required to be paid to the workmen by the employer, to each
according to the nature and amount of the services performed.
The contributions were stipulated to be 5% of the total payroll
of union members employed by the employer to be paid directly
to the trustees of the welfare fund; and 3% of the same payroll
also to be paid directly to the trustees of the pension fund.
There then follow provisions negativing any direct interest in
the funds by employee members and preserving the right to
benefits of employees whose employers have defaulted in
making contributions.

The sureties argue strenuously, and Special Term agreed
with them, that there is a sharp dichotomy between wages and
contributions; that the bond protects wages and not indirect
welfare contributions; that this being a '' common-law '' bond,
one looks only to the documents to determine their effect, and
that, therefore, the fund trustees may not recover on the bond.
Assuming for the moment, that wages and welfare contributions
in this context are mutually exclusive, the analysis is faulty.
The bond explicitly covers wages and compensation, and it must
be assumed that the word '' compensation '' is more than a
surrender to the draftsman's affection for cautious tautology.
One would still be left with the question whether '' compensa-
tion '', meaning something more than wages, includes welfare
contributions. Hence, analysis is not furthered by a general
reference to wages and compensation, and then examining
narrowly the concept of wages (in some instances as it was
evolved in a much simpler economy than the one in which
these documents were executed) and ignoring at the same time
the significance of the word '' compensation '' in the very
same clause.

Nor is the problem advanced in solution by precious selec-
tion from decisional and statutory precedents in which the term
'' wages '' occurs and then by argument therefrom deducing
that '' wages '' exclude welfare contributions or include them.
Thus, it is true that for internal revenue purposes wages do
not include welfare contributions made by the employer. At
the same time, it is also true that for purposes of determining
priority in the payment of debts under assignments made in
accordance with the Debtor and Creditor Law, wages do include

welfare contributions made by employers (Debtor and Creditor Law, § 22; *Matter of Larry Jay, Inc.,* 3 A D 2d 386). Then again, wages do not include employer welfare contributions for certain purposes of the criminal law (Labor Law, § 196; Penal Law, § 1272; *People* v. *Vetri,* 309 N. Y. 401).

As was so well said by COHN, J., then sitting with the Court of Appeals, in the *Vetri* case (*supra,* p. 407): " To be sure, the term ' wages ' broadly interpreted includes all of the benefits, monetary or otherwise, which an employee derives from a master and servant relationship. However, the sense in which it is used in a given statute depends not only upon the wording of the statute but upon the purpose of the law as well. The liberal interpretation placed upon it in actions involving civil remedies of employees does not apply to the word as used in a criminal statute. The decisions in civil actions are based upon different considerations and they may not enlarge an employer's criminal responsibility beyond that indicated by the criminal statute itself." And there the court was limiting its first comments to the use of the term " wages " in statutes; the comments are all the more applicable when the term is used in contracts.

Starting then with the language in the bond in suit, protection is provided for wages and compensation for labor performed and services rendered. The question quite simply is: Were the employer contributions to the funds a part of the wages and compensation for which the employer was bound in contract to pay? The following indicia are present: The collective bargaining agreement bound the employer to make the direct payments and also the beneficial contributions. Once the agreement was made the employer was as much bound to pay welfare fund contributions as he was to pay wages. If an employer thereafter refused to perform in either respect, the union employees would not be obtainable and the work of the contract with the city would not be performed. Finally, the employer contributions were payments designed to yield future financial benefits for the employees depending upon needs, age, and length of service, but directly related to and arising from service in employment.

Turning to the intent and purpose of the city in requiring the bond, it is evident that the city was interested in obtaining performance of the contract and receipt of the work free from interruptions. Only a bond which included protection of the entire *quid pro quo* for the workmen's services would meet that need. Surely, a payment bond which expressly excluded employer welfare contributions from its protection, if made

known to the union, would more likely signal a stoppage of the work rather than its inception or smooth continuance. It was this intent and purpose of the city that the employer was required to satisfy, and that the compensated sureties undertook to guarantee.

All of this is consonant too with the economic purposes served in broadening the supply of contractors, who, partially independent of their own limited resources, can compete for contracts with the risk to those who let the contracts secured by the adhesion of both payment and performance bonds.

This is the practical business context in which this payment bond was given, not whether the wages or compensation of the workmen were more or less taxable, to-day or to-morrow, by the Federal Government under the internal revenue laws. Accepting then, as one should, the view of the sureties that the intent of parties to the payment bond governs its interpretation, it is concluded that the manifested intention was to protect the entire economic benefit the workmen were to receive for the labor performed and the services rendered, and the words '' wages and compensation '' amply describe that entire economic benefit to be paid directly or to be paid on their behalf.

The next and subsidiary question raised is that of the right of the trustees to sue. The bond expressly provided that the unpaid workmen and materialmen have a direct right of action on the bond. From this, the sureties argue that others, such as the fund trustees, are excluded from that right. That does not follow. The express inclusion of the right to sue simply served to make clear, all the more, that the workmen and the materialmen were to be benefited directly by the bond, thus avoiding the tenuous and refined speculation involved in cases where such express provision has been lacking. (Cf., e.g., *Daniel-Morris Co.* v. *Glens Falls Ind. Co.*, 308 N. Y. 464 and the cases cited therein.) Nor do the fund trustees sue in their own right for labor performed or services rendered by them, but in the right of the workmen as beneficiaries of the funds. So, the workmen are both named and intended beneficiaries of the payment bond, but with respect to rights for which they cannot sue directly, their trustees or assignees (which label is used for the concept is not important) have the right to sue, in the absence of express exclusion from the payment bond.

Subsequent to the decision in this case by Special Term, the United States Supreme Court determined the case of *United States* v. *Carter* (353 U. S. 210), where it held that welfare fund trustees could sue and recover on a payment bond for defaulted employer contributions as included within wages.

With one exception, that case is precisely identical with this, and its reasoning is forceful and applicable to the issues in this case. There, too, suit was brought against sureties on a payment bond to recover for employer contributions to a welfare fund in which there had been a default by the contractor. There, also, the significance of the word "wages" was construed. There, too, the right to sue of the trustees of the welfare fund was involved. In all of these questions the court found that the unpaid contributions were a part of the "wages" for the work to be done and that the trustees were entitled to sue. Indeed, the court said that the trustees' relationship to the employees, as established by the master labor agreement and the trust agreement was closely analogous to that of an assignment. It assumed that it was indisputable that an assignee of the workman could sue. The difference in that case and this one was simply that the payment bond in the *Carter* case was required to be given under the Miller Act (U. S. Code, tit. 40, §§ 270a, 270b, 270c). As a consequence, the bond was to be construed not only in accordance with its own terms, but in accordance with the requirement of the statute. Thus, it was a "statutory", rather than a "common-law", bond. On the other hand, the Miller Act provided "protection" and the right to sue for "sums justly due him", referring to the workman or materialman. On the analysis made here it is thus quite immaterial that the bond in the *Carter* case was a statutory bond while the bond in this case is a common-law bond. In either case, the language to be construed is identical with the one exception that the language in the instant bond with reference to "wages and compensation" is much broader than that contained in the Miller Act, if one examine the statute as a whole and consider the provision which provides the right to sue on the bond (U. S. Code, tit. 40, § 270b).

Accordingly, the order granting defendant sureties' cross-motion for summary judgment and denying plaintiff trustees' motion for summary judgment should be reversed on the law, the cross-motion denied, and plaintiff trustees' motion for summary judgment granted, together with the costs and disbursements of the appeal to appellants.

Botein, P. J., Rabin, Frank and Bergan, JJ., concur.

Order unanimously reversed on the law, with $20 costs and disbursements to the appellants; the cross-motion of the defendants-respondents for summary judgment is denied and the motion of the plaintiffs-appellants for summary judgment,

pursuant to rule 113 of the Rules of Civil Practice, is granted, with $10 costs; and judgment is directed to be entered in favor of the plaintiffs against the defendants, Maryland Casualty Company, American Employers Insurance Company, New Amsterdam Casualty Co. and Travelers Indemnity Company, for the relief demanded in the complaint, with costs.