NATIONAL ELECTRICAL INDUSTRY FUND ET AL. V.
BETHLEHEM STEEL CORPORATION

[No. 125, September Term, 1982.]

*Decided August 15, 1983.*

542

The cause was argued before SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.; and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), specially assigned.

*Mary Ellen Signorille,* with whom were *Abato & Abato, P.A.* on the brief, for appellants.

*Robert M. Wright,* with whom were *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellee.

RODOWSKY, J., delivered the opinion of the Court.

These eight consolidated cases are brought under the mechanics' liens law by a labor union and by various funds to which employer remittances are required to be made under a collective bargaining agreement. Standing of the plaintiffs is the principal issue. We shall hold that each plaintiff's petition sufficiently reflects its standing to sue to withstand demurrer.

During 1981-1982 the appellee, Bethlehem Steel Corporation (Bethlehem), had a coke oven battery and other facilities constructed on its property at Sparrows Point, Maryland. Bethlehem's general contractor subcontracted with Mid-States Electric, Inc. (Mid-States) for electrical work. Mid-States had bound itself to comply with the collective bargaining agreement entered into between the Baltimore division of the Maryland chapter (NECA Local) of the National Electrical Contractors Association, Inc. (NECA) and Local Union No. 24 (the Union) of the International Brotherhood of Electrical Workers (IBEW).

In addition to paying its electrical workers the hourly rates established in the Union contract, Mid-States agreed, on a monthly reporting and remitting basis, to:

1. Contribute an amount equal to 3% of its gross labor payroll to the National Employees Benefit Board (Benefit Fund), established under a national agreement between NECA and IBEW;

2. Contribute to the Maryland Electrical Industry Health & Welfare Fund (Welfare Fund) $.90 for each hour worked by a covered employee;

3. Contribute to the Maryland Electrical Industry Pension Fund (Pension Fund) $.70 ($.80 after September 30, 1981) for each hour worked by a covered employee;

4. Contribute to the Maryland Electrical Industry Severance & Annuity Fund (Severance Fund) $.60 ($.70 after September 30, 1981) for each hour worked by a covered employee;

5. Contribute .5% of its gross labor payroll to the NECA Local and Union Joint Apprenticeship and Training Trust Fund (JATC Fund);

6. Deduct $.60 per hour from the net wages of each covered employee and pay over those deductions to the Union Vacation and Holiday Fund (Vacation Fund);

7. Deduct working dues from the pay of each IBEW member, based on signed authorizations, and pay over such deductions to the Union; and

8. Contribute 1% of the productive labor payroll (with certain exclusions) to the National Electrical Industry Fund (Industry Fund).

We shall refer to the Benefit, Welfare, Pension, Severance, Vacation and JATC Funds collectively as the "Trusts," and to the Union, the Trusts and the Industry Fund collectively as the "Appellants."

For each of the months of August, September and October, 1981 Mid-States made a consolidated report to the Appellants of the amounts to be remitted by it for the eight purposes listed above, but Mid-States did not remit the amounts due. On December 7, 1981 each Appellant gave notice to Bethlehem of intent to claim a lien under the Mechanics' Liens Law, Md. Code (1974, 1981 Repl. Vol.), §§ 9-101 through 9-113 of the Real Property Article (the Act). On April 16, 1982 each Appellant filed a petition to establish and enforce a mechanics' lien on the portion of Bethlehem's property where Mid-States had been working. Bethlehem filed demurrers which the trial court sustained with prohibition of further amendment. That court reasoned that the Appellants were "not within those contemplated in [the Act] to bring a mechanic's lien action." We issued the writ of certiorari on our own motion prior to consideration of the appeals by the Court of Special Appeals.

Section 9-102 (a) of the Act provides in relevant part that "[e]very building erected . . . is subject to establishment of a lien in accordance with this subtitle for the payment of all debts, without regard to the amount, contracted for work done for or about the building . . . ." The scheme of the Act distinguishes between a "contractor" and a "subcontractor." The contractor "has a contract with an owner," § 9-101 (c), while "subcontractor," under § 9-101 (f), "means a person who has a contract with anyone except the owner or his agent." The extremely broad definition of "subcontractor" is narrowed by § 9-101 (b) which defines "contract" as "an agreement of any kind or nature, express or implied, for doing work or furnishing material, or both, for or about a building as may give rise to a lien under this subtitle."

(1)

Appellants' primary position is that they are subcontractors and that the collective bargaining agreement is a contract "for doing work." However, for purposes of imposing mechanics' liens under the Act, contracts of subcontractors must be for doing work "for or about a building . . . ." The collective bargaining agreement does not satisfy that element of the test.

The Union contract does not address the project at Bethlehem which is the subject of the claimed liens.[1] Indeed, that contract does not relate to work to be done on any specific building. Nor does the Union, which is the only Appellant that is a party to the collective bargaining agreement, undertake to perform any work itself for or about any building. There is no allegation of any contract to which any of the Trusts or the Industry Fund are parties for the performance of work about any building. The Union contract simply sets forth the terms and conditions of employment for

---

1. Whether the construction at Bethlehem was of a "building," within the meaning of the Act, is another issue between the parties, but it is not before us on this appeal.

electrical workers, in the metropolitan Baltimore area and in portions of the Eastern Shore, by employers who have accepted NECA Local as their collective bargaining representative.

Appellants' theory that the collective bargaining agreement is a contract for doing work for or about Bethlehem's project is similar to the contention which this Court rejected in *Giles v. First National Realty,* 238 Md. 203, 208 A.2d 582 (1965). There the lien claimant had leased equipment to a subcontractor who was responsible for grading a construction site. Employees of the subcontractor actually operated the equipment. We said (*id.* at 207, 208 A.2d at 584):

> [T]he lessor was not entitled to a lien either on the theory that the supplying of the equipment on a rental basis constituted "work done" or on the theory that the charges for the use of the equipment constituted a debt "contracted for work done." This is so because the lessor had done no work for or about the premises. In order for it to come within the plain meaning and obvious purpose of the statute it was necessary for it to have actually participated in the performance of the work done, and this necessitated something more than taking the equipment to the site of the job, keeping it in running order while it was there, and removing it when the grading was completed.

There is, however, another aspect to the relationships between employer, union and bargaining unit employees. There are individual contracts of hire between Mid-States and electrical workers it employed. In *J.I. Case Co. v. National Labor Relations Board,* 321 U.S. 332, 334-36, 64 S. Ct. 576, 579, 88 L. Ed. 762, 766 (1944) the Supreme Court articulated the two concepts.

> Contract in labor law is a term the implications of which must be determined from the connection in which it appears. Collective bargaining between employer and the representatives of a unit, usually

a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment. Without pushing the analogy too far, the agreement may be likened to the tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules for service, which do not of themselves establish any relationships but which do govern the terms of the shipper or insurer or customer relationship whenever and with whomever it may be established. . . .

After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hirings. The employer, except as restricted by the collective agreement itself and except that he must engage in no unfair labor practice or discrimination, is free to select those he will employ or discharge. But the terms of the employment already have been traded out. There is little left to individual agreement except the act of hiring. This hiring may be by writing or by word of mouth or may be implied from conduct. In the sense of contracts of hiring, individual contracts between the employer and employee are not forbidden, but indeed are necessitated by the collective bargaining procedure.

Although the collective bargaining agreement is not a contract for work at Bethlehem, employees of Mid-States were directed, as part of their individual contracts, to perform their work for Mid-States at Bethlehem. Accordingly, each electrical worker employed by Mid-States at

Bethlehem was a subcontractor as defined in the Act, because each had a contract with someone, other than the owner, for doing work for or about the "building." In *Diener v. Cubbage,* 259 Md. 555, 270 A.2d 471 (1970), we held that a predecessor to the Act, *i.e.,* Md. Code (1957, 1968 Repl. Vol.), Art. 63, § 1 *et seq.,* included individuals who rendered labor only. The same is true of the present statute.

## (2)

The foregoing analysis sets the framework for consideration of the standing issue. We shall separately treat the standing of the Trusts, of the Union, and of the Industry Fund.

A considerable body of authority in analogous situations supports the standing of Trustees of fringe benefit trusts to claim on behalf of those who actually rendered the labor.[2] The leading case arose under the Miller Act, 49 Stat. 793 (codified as amended at 40 U.S.C. §§ 270a-270d (1976)). That statute in part provided that "[e]very person who has furnished labor or material in the prosecution of the work provided for in [the construction] contract, in respect of which a payment bond is furnished under this Act ... shall have the right to sue on such payment bond ... for the sum or sums justly due him ...." Trustees of a health and welfare fund for construction workers established under a collective bargaining agreement sued under the Miller Act for the amount of contributions that the employer had not paid. *United States v. Carter,* 353 U.S. 210, 77 S. Ct. 793, 1 L. Ed. 2d 776 (1957) held that the trustees had standing to sue on the following rationale.

> If the assignee of an employee can sue on the bond, the trustees of the employees' fund should be able to do so. Whether the trustees of the fund are, in a technical sense, assignees of the employees'

---

2. No issue has been presented here over the fact that the Trusts have sued in the names by which they are known in the industry, as opposed to naming as parties plaintiff the trustees in that capacity.

rights to the contributions need not be decided. Suffice it to say that the trustees' relationship to the employees, as established by the master labor agreements and the trust agreement, is closely analogous to that of an assignment. The master labor agreements not only created Carter's obligation to make the specified contributions, but simultaneously created the right of the trustees to collect those contributions on behalf of the employees. The trust agreement gave the trustees the exclusive right to enforce payment. The trustees stand in the shoes of the employees and are entitled to enforce their rights.

Moreover, the trustees of the fund have an even better right to sue on the bond than does the usual assignee since they are not seeking to recover on their own account. The trustees are claiming recovery for the sole benefit of the beneficiaries of the fund, and those beneficiaries are the very ones who have performed the labor. The contributions are the means by which the fund is maintained for the benefit of the employees and of other construction workers. For purposes of the Miller Act, these contributions are in substance as much "justly due" to the employees who have earned them as are the wages payable directly to them in cash. [*Id.* at 219-20, 77 S. Ct. at 798, 1 L. Ed. 2d at 784.]

It has been held that health & welfare, pension and vacation savings trusts could recover "on behalf of employees" under a statutory bond protecting " 'any person furnishing labor . . . used in the direct performance of a construction contract.' " *United States Fidelity & Guaranty Co. v. Arizona State Carpenters Health and Welfare Trust Fund,* 120 Ariz. 79, 80, 81, 584 P.2d 60, 61, 62 (Ariz. Ct. App. 1978). Where the condition of a statutory bond was the prompt payment of all debts incurred, including those for labor, by the principal or any subcontractor in the prosecution of a public works contract, the trustees of union pension and

apprenticeship funds were said to "stand in the shoes of the employees." *Trustees, Florida West Coast Trowel Trades Pension Fund v. Quality Concrete Co.,* 385 So. 2d 1163, 1166 (Fla. Dist. Ct. App. 1980). Trustees of welfare and pension funds could sue "in the right of the workmen as beneficiaries of the funds" on a common law bond covering a contractor's failure to pay wages and compensation for labor performed in *Martin v. William Casey & Sons, Inc.,* 5 A.D.2d 185, 170 N.Y.S.2d 228 (1958), *aff'm mem.,* 8 N.Y.2d 728, 167 N.E.2d 646, 201 N.Y.S.2d 104 (1960). For other such cases dealing with claims on bonds, see *Bernard v. Indemnity Insurance Company of North America,* 162 Cal. App. 2d 479, 487, 329 P.2d 57, 63 (1958) (trustees sue as "assignees under an equitable assignment"); *Dobbs v. Knudson, Inc.,* 292 N.W.2d 692, 696 (Iowa 1980) (trusts have "contractual right to make the claim for" the employees); *Reliance Insurance Co. v. Commonwealth, Department of Transportation,* 576 S.W.2d 231, 237 (Ky. Ct. App. 1978) ("[T]he trustees of the funds [are] the proper parties to bring this action and file claims on behalf of the laborers."); *Crabtree v. Lewis,* 86 Wash. 2d 282, 544 P.2d 10 (1975) (trustee sues on behalf of employees).

A mechanic's lien statute embracing "[a]ny person . . . furnishing labor . . . in the improvement of real property" was involved in *Hawaii Carpenters' Trust Funds v. Aloe Development Corp.,* 63 Haw. 566, 568 n.1, 633 P.2d 1106, 1108 n.1 (1981). Trustees of union pension, health & welfare, apprenticeship & training, and vacation & holiday trust funds were allowed liens in reliance on *United States v. Carter, supra.* The Supreme Court of Hawaii found it unnecessary to decide whether the trustees were, in a technical sense, assignees of the beneficiaries.

Bethlehem relies on *Ridge Erection Co. v. Mountain States Telephone & Telegraph Co.,* 37 Colo. App. 477, 549 P.2d 408 (1976). It is the only case disclosed by our research to be contrary to the opinions cited above. The decision is distinguishable. The court considered that the Colorado mechanics' lien statute contained "an express and exhaustive enumeration of those classes of persons entitled to claim

a mechanic's lien," and that "[c]onspicuously absent from [that] list [was] the express grant of a lien claim to trustees for unpaid contributions to employee trusts." *Id.* at 480, 549 P.2d at 411. That court considered to be of even greater significance an amendment to the Colorado statute. The amendment specifically included such trusts as lienors; however, it became effective after the events giving rise to the litigation.

Turning to the instant matter, we note that the record before us in each case includes the petition, a copy of the collective bargaining agreement, Mid-States' letter of assent thereto, the August, September and October, 1981 itemized reports by Mid-States of monies due, an affidavit by the business manager of the Union, and an affidavit by the individual who administers the Welfare, Pension, Vacation and Severance Funds.[3] The record does not include the agreements or declarations establishing the six Trusts. Nevertheless, for purposes of testing on demurrer, the petitions of the six Trusts sufficiently reflect that they operate for the benefit of the employees on whose behalf the Trusts are claiming. The Trusts are presumed to be complying with § 302 (c) of the *Labor Management Relations Act,* 29 U.S.C. § 186 (c).

Title 29 U.S.C. § 186 (a) generally prohibits payment by an employer to any representative of, or to any labor organization representing any of, the employees of that employer. Under § 186 (c), the prohibition does not apply

> ... (5) with respect to money ... paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents ... for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment

---

**3.** Section 9-105 (a) (2) of the Act and Maryland Rule BG71 b require the petition to establish a mechanic's lien to be supported by an affidavit.

benefits or life insurance, disability and sickness insurance, or accident insurance . . . (6) with respect to money . . . paid by any employer to a trust fund established by such representative for the purpose of pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs . . . .

In sum with respect to the Trusts, Mid-States had individual contracts of hire with electrical workers. The terms of each worker's employment are found in the collective bargaining agreement. Those terms include promises by Mid-States to make payments to the Trusts. Failure by Mid-States to pay as promised created a debt contracted for work for or about a building within the meaning of § 9-102 (a) of the Act. That work had been performed by the electrical workers. Subject to the other requirements of the Act, this gave rise to a mechanics' lien in favor of the electrical workers as "subcontractors" under the Act. Those mechanics' lien claims may be asserted, and notices of intent to assert such claims may be given, by the Trusts on behalf of the electrical workers, because the Trusts operate for the benefit of the workers, and payments by Mid-States to the Trusts are recognized as beneficial to the workers by federal labor law.

The claim of the Union for dues checked off can rest on a different analysis. As to this claim, the Union is an assignee of Mid-States' employees in the strict sense. Title 29 U.S.C. § 186 (c) (4) permits payments by an employer to a labor organization of monies deducted from employees' wages in payment of membership dues, subject to the proviso that "the employer has received from each employee, on whose account such deductions are made, a written assignment . . . ."

The petition by the Industry Fund is more difficult. That Fund was the focus of litigation in which NECA and IBEW were held to have violated the federal antitrust laws. *See National Constructors Association v. National Electrical Contractors Association,* 498 F. Supp. 510 (D. Md. 1980),

*affm'd as modified,* 678 F.2d 492 (4th Cir. 1982), *petition for cert. filed,* 51 U.S.L.W. 3535 (U.S. Jan. 18, 1983) (82-1146). The United States District Court described the Industry Fund as "used primarily to cover NECA's 'costs of administration of labor agreements, industry advancement and services rendered to the electrical contracting industry.'" 498 F. Supp. at 517. The Industry Fund seems to consist of electrical contractors' contributions to the employers' trade association. There is also outstanding against IBEW an injunction which prohibits, under certain circumstances, enforcement against non-members of NECA of the Industry Fund provision in the national agreement between NECA and IBEW. However, on the record before us, the petition of the Industry Fund alleges that members of the Union "are participants in and beneficiaries of plaintiff, National Electrical Industry Fund." In light of these allegations, the Industry Fund petition is sufficient to withstand demurrer. For pleading purposes at this stage of the case, it should be treated similarly to the petitions of the Trusts. The intriguing questions raised by the antitrust litigation will have to be resolved on further proceedings in the trial court.

(3)

Bethlehem argues that the judgments in its favor can be sustained on a ground advanced to, but not relied upon by, the trial court. The contention is that both the notices of intent to claim a lien and the lien petitions are defective on their faces for failure to specify (1) the names of the employees providing labor to the project; (2) the dates upon which the employees provided labor; and (3) the amount being claimed on behalf of each employee provided labor.

Each Appellant sent a lien notice on December 7, 1981. Each lien notice claimed a specific dollar amount as due and unpaid to the Appellant. Each notice stated that the Appellant's participants or members did work on Bethlehem's property from January 21, 1981 through October 20, 1981. Attached to each notice and petition were the reports filed by

Mid-States for August, September and October, 1981. A report is a consolidated form for all Appellants. These forms set forth tabularly, for each employee employed during the month reported, the employee's name, social security number, total clock hours worked and gross earnings. Preprinted on each report was the specific factor by which hours or earnings were to be multiplied in order to determine the amount to be remitted by the employer to a particular Appellant. The computations were made using total monthly hours, or total monthly earnings, of all employees reported.

Bethlehem refers us to *Himelfarb v. B & M Weld. & Iron Wks.,* 254 Md. 37, 41, 253 A.2d 842, 844 (1969), where we reiterated the general rule respecting notices of intent to claim mechanics' liens by quoting from *Welch v. Humphrey,* 200 Md. 410, 414, 90 A.2d 686, 687 (1952).

> "It has always been held in Maryland that if the notice is given to the owner of the property before the lien claim is filed, it should definitely state the intention of the claimant to claim the lien, and also fully and specifically state the particulars of the claim and the nature and kind of work done or materials furnished, *the time when done or furnished,* and the amount of the claim." (Emphasis added) . . . .

*See also Mimsco Steel v. Holloway Concrete,* 261 Md. 137, 274 A.2d 90 (1971); *U.S. Tile & Marble v. B & M Welding,* 254 Md. 81, 253 A.2d 838 (1969).

These cases, and similar decisions, were ones in which the person claiming the lien did so in his own right as the person who had furnished materials or labor. Here the labor has been furnished by the employees, but the debts generated by that labor are payable to the Appellants. Under these circumstances we believe the notices filed were sufficient. The employees who rendered the labor are identified. The total debt claimed as payable to each Appellant is specified. The portion of the total payable to each Appellant which is attributable to each employee is calculable. We see no

purpose to be served in requiring the calculation per individual employee to be made, when payment is not to be made to each employee but rather to an Appellant if a lien can be established.

With respect to the time when the work was performed, the notice of lien and lien petition in each case allege that participants in an Appellant worked on the Bethlehem project through October 20, 1981. The October report, which is an exhibit to each notice and petition, reflects employees at work for Mid-States in that month. It is also clear from the reports that some electrical workers did no work for Mid-States after August 1981, *i.e.,* they ceased work more than 90 days before the notices.

Bethlehem's argument of deficiency with respect to time highlights why the Appellants' primary argument was that the collective bargaining agreement is the contract for work for or about the "building." Were that so, Appellants' position would be that the 90 day notice requirement of § 9-104 of the Act is satisfied, because it is to be measured by the last day on which any Mid-States' employee worked at Bethlehem under the collective bargaining agreement. We have not accepted Appellants' premise as a matter of mechanics' liens law. What each petition presents is a joinder of claims for mechanics' liens of the individual electrical workers. In the Union's case it sues as assignee of the individuals. In the other cases, the Trusts and Industry Fund sue on behalf of the individuals. Our individualized claim analysis means that some of the claims are too late. But it does not follow that Bethlehem's demurrers are to be sustained.

Each petition also reflects on its face that there are some employees on whose behalf claim is made and as to whom notice was timely given. Bethlehem filed a general demurrer. It goes to the entire petition in each case. A general demurrer in equity which is good only as to part of a bill is to be overruled. *See Causey v. Gray,* 250 Md. 380, 243 A.2d

575 (1968); *Levin v. Hirschman,* 158 Md. 162, 148 A. 228 (1930); E. Miller, *Equity Procedure as Established in the Courts of Maryland,* § 134, at 173 (1897).

> *Judgments of the Circuit Court for Baltimore County reversed and cases remanded for further proceedings.*
>
> *Costs to be paid by Bethlehem Steel Corporation.*