773 A.2d 573

**JUDD FIRE PROTECTION, INC.,**

v.

**Larry DAVIDSON, et al.**

No. 1180, Sept. Term, 2000.

Court of Special Appeals of Maryland.

June 1, 2001.

**656**

E. Pete Summerfield (Summerfield, Willen, Silverberg & Limsky, P.A., on the brief), Owings Mills, for appellant.

William W. Osborne, Jr. and Charles W. Gilligan (Osborne Law Offices, P.C. and O'Donoghue & O'Donoghue, on the brief), Washington, DC, for appellees.

Submitted before KENNEY, KRAUSER and RAYMOND G. THIEME, Jr. (Ret'd, specially assigned), JJ.

KENNEY, Judge.

This appeal arises from a decision of the Circuit Court for Baltimore County granting a mechanic's lien that had been opposed by appellant, Judd Fire Protection, Inc. ("Judd"). Judd raises three issues on appeal, which we have reworded as follows:

 1. Did the trial court err in finding that individual employees of a sub-subcontractor had standing to bring an

action against a subcontractor under Maryland's Mechanics' Lien statute when the sub-subcontractor furnished the subcontractor with a Mechanics' Lien release?

2. Did the trial court err when it failed to use the contract price as the measure of damages?

3. Did the trial court err by failing to offset judgments in favor of those Appellees who previously were awarded restitution by the District Court in criminal proceedings against their employer, Steven Ramsey, the owner of SDR Fire Protection?

For the reasons set forth below, we answer the first question in the negative and the second in the affirmative. We do not reach the third question.

## FACTUAL BACKGROUND

The property involved in this case is an apartment building owned by Woodlawn Limited Partnership ("Woodlawn") and known as "Parkview at Woodlawn." Woodlawn had entered into a general contract with Whiting–Turner, Inc. ("Whiting–Turner") for construction of the building. Whiting–Turner subsequently subcontracted with Judd to install the automatic fire sprinkler systems (the "sprinkler system").

Judd began installation of the sprinkler system in September of 1998. In October of 1998, Whiting–Turner accelerated the timetable for completion of the project. In order to meet the accelerated schedule, Judd was obliged to enter into a series of subcontracts with SDR Fire Protection ("SDR"), a business owned by Steven Ramsey. Appellees in this case were SDR employees.

Judd and SDR entered into four subcontracts, one for each floor on the west side of the building. SDR was responsible for installing a total of 749 sprinkler heads and pipes, and it was also responsible for testing the system after installation. The total contract price was $13,987 and covered labor only. Ramsey testified that the contract price "was done on a by the head basis." Judd testified that the contract price was based on $17 per sprinkler head.

SDR first sent people to the site on or about November 21, 1998. SDR and its employees entered into a collective bargaining agreement on or about December 4, 1998.

SDR had completed about 85% of its work on the first floor, the attic, and the second floor when its employees walked off the job because their paychecks were being returned for insufficient funds. The date of the work stoppage was disputed.[1] In addition to failing to pay its employees, SDR did not have the proper insurance coverage required by its contracts with Judd.

As a result of SDR's labor problems, Judd entered into an agreement whereby it paid SDR for work completed, less insurance payments made by Judd, and SDR signed a Lien Release. Judd paid SDR a total of $7,243.69,[2] which it calculated by multiplying $17 by the number of sprinkler heads actually installed. The Lien Release included a provision that materialmen would not be entitled to assert any liens against either the property or Judd. SDR did not obtain lien releases from any of the employees who had been working on the site.

Ramsey eventually was convicted of check fraud and was incarcerated at the time of the proceedings before the circuit court on the mechanic's lien claim. In addition, some of the employees who had worked on the project had filed civil suits against Ramsey and obtained judgments, which were not satisfied. Consequently, on February 9, 1999, ten of SDR's former employees filed a Petition to Establish Mechanics' Lien against the Parkview at Woodlawn property. The plaintiffs in the action were: Larry Davidson, William Gilliam, Mike Green, John Hodge, Dennis Johnson, Melvin Morrison, Gary Nokes, Steve Randall, David Shirley, and Anthony S. Wood (the "plaintiffs"). They requested a lien in the amount of $37,910.52.

---

1. Judd stated that the work stopped on December 11, 1998, and appellees contended that they stopped work on December 18, 1998.

2. Of the total amount, $1,500 represented a prior payment, and $5,743.69 represented Judd's final payment.

Judd intervened in the case and filed an answer on April 20, 1999, on behalf of both Woodlawn and Whiting–Turner. That same day, Judd filed a motion to compel arbitration,[3] which the circuit court granted. The plaintiffs, unhappy with being ordered to arbitrate, filed a motion to alter or amend judgment on July 16, 1999, which the court granted.[4]

A hearing was held on April 17, 2000, and, at its conclusion, the court entered judgment in favor of Judd against Larry Davidson, Melvin Morrison, Gary Nokes, and David Shirley, all of whom failed to appear at the hearing. Counsel then submitted closing arguments by memoranda, and the parties returned to court on June 1, 2000.

Following a hearing, the court entered judgment against Judd and in favor of the remaining six plaintiffs. The court found that the plaintiffs were "entitled to recover the reasonable value of the services rendered in each instance by each employee considered separately." The court then ordered Judd to pay damages as follows: (1) to Michael Green the sum of $3,973.93; (2) to John Hodge the sum of $3,973.93; (3) to Steven Randall the sum of $2,299.79; (4) to William Gilliam the sum of $3,870.36; (5) to Dennis Johnson the sum of $1,984.80; and (5) to Anthony Woods the sum of $2,669.47. The court also assigned to Judd any judgments and orders of restitution obtained by any of the six plaintiffs against Ramsey as a result of prior criminal or civil proceedings. This appeal followed.

## DISCUSSION

### *Standard of Review*

When an action has been tried without a jury, we review the case on both the law and the evidence, but we will not reverse a case on the evidence in the absence of clear

---

**3.** The subcontracts between Judd and SDR provided that the parties would arbitrate any disputes.

**4.** The court orally granted appellees' motion without comment at a hearing on July 16, 1999.

error. Md. Rule 8–131(c); *Narayen v. Bailey,* 130 Md.App. 458, 461, 747 A.2d 195 (2000). Our review on matters of law, however, is more expansive. *Narayen,* 130 Md.App. at 461, 747 A.2d 195.

## *I. Standing*

Judd first argues that appellees lacked standing to maintain an action under Maryland's Mechanics' Liens statute, Md. Code (1974, 1996 Repl.Vol., 1999 Supp.), § 9–101 *et seq.* of the Real Property Article ("RP").

A mechanics' lien is a statutorily created in rem remedy. As an in rem proceeding against property, an action to establish and enforce a mechanics' lien is "effective against the owner [of the property], for [the benefit of] subcontractors who perform their contractual obligations but are not paid." The mechanics' lien law allows "a creditor for labor or materials to proceed in rem against improved property even though he could show no privity of contract with the owner, nor personal liability of the owner to him." Without the mechanics' lien remedy, such a creditor would have no recourse against the property or the ultimate owner of the property, even though the owner would enjoy the improvements to the property made possible by the creditor's work and materials. Instead, the creditor's remedy would be limited to obtaining a judgment against the person with whom he contracted, who would likely have no interest in the property and might be without assets.

Mechanics' liens are creatures of statute. As such, to be entitled to a mechanics' lien against property in Maryland, one must satisfy the substantive and procedural criteria set forth in the Act. Section 9–102(a) of the Act provides that:

> [e]very building erected ... is subject to establishment of a lien in accordance with this subtitle for the payment of all debts ... contracted for work done for or about the building and for materials furnished for or about the building....

*Wolf Org. v. Oles,* 119 Md.App. 357, 366–67, 705 A.2d 40 (1998) (citations omitted).

In ruling that appellees had standing, the trial court relied on two cases, *Diener v. Cubbage,* 259 Md. 555, 270 A.2d 471 (1970), and *Nat'l Elec. Indus. Fund v. Bethlehem Steel Corp.,* 296 Md. 541, 463 A.2d 858 (1983). It found that both of those cases, which appear to be the only Maryland cases dealing with this subject, stand for the proposition that, by virtue of their employment, appellees were subcontractors under the statutory definition of a subcontractor.

 Judd argues that Maryland courts, including the *Diener* and *Bethlehem Steel* courts, have not directly addressed the issue of whether at-will employees have standing to bring a suit for a mechanic's lien. Although appellees appeared to have been at-will employees,[5] we do not believe that this aspect of their employment status is ultimately relevant to our discussion.

In *Diener,* the subcontractor, Suburban Carpentry Corporation, sub-subcontracted with two individuals, Lewis and David Cubbage to do carpentry work on a townhouse project. *Diener,* 259 Md. at 557, 270 A.2d 471. In the case at bar, the subcontractor, Judd, contracted with a corporate sub-subcontractor that was then left to its own devices as to how to fulfill its end of the bargain.

---

**5.** Appellees never disputed that they were at-will employees. "An [employment] agreement is deemed at-will, and thus terminable without cause, when it fails to specify a particular time or event terminating the employment relationship." *Samuels v. Tschechtelin,* 135 Md.App. 483, 525, 763 A.2d 209 (2000). By all accounts, appellees worked for SDR generally and were not hired solely to fulfill the Judd/SDR contract. A collective bargaining agreement was signed on December 4, 1998 between SDR and the Road Sprinkler Fitters Local Union 669. A collective bargaining agreement is a "contract that is made between an employer and a labor union and that regulates employment conditions." Black's Law Dictionary 257 (7th ed.1999). The collective bargaining agreement provided a framework for dealings between appellees and SDR after it was concluded, but it did not transform them into contract employees.

In *Bethlehem Steel,* Mid–States, a subcontractor, had entered into a collective bargaining agreement with its employees. As Judge Rodowsky pointed out, in a collective bargaining situation, "[t]here are individual contracts of hire between Mid–States and electrical workers it employed." *Bethlehem Steel,* 296 Md. at 546, 463 A.2d 858. He went on to say:

> Although the collective bargaining agreement is not a contract for work at Bethlehem, employees of Mid–States were directed, as part of their individual contracts, to perform their work for Mid–States at Bethlehem. Accordingly, each electrical worker employed by Mid–States at Bethlehem was a subcontractor as defined in the Act, because each had a contract with someone, other than the owner, for doing work for or about the "building."

*Bethlehem Steel,* 296 Md. at 547–48, 463 A.2d 858.

Despite appellees' status as employees of SDR, they were also subcontractors under the statute who could file for a mechanic's lien. A subcontractor is defined as "a person who has a contract with anyone except the owner or his agent." RP § 9–101(g). A contract is a prerequisite to establishing a lien. *Kaufman v. Miller,* 75 Md.App. 545, 548, 542 A.2d 391 (1988). " 'Contract' means an agreement of any kind or nature, express or implied, for doing work or furnishing material, or both, for or about a building." RP § 9–101(c).

In the instant case, although appellees entered into a collective bargaining agreement with SDR, they did not do so until December 4, 1998, after they commenced work in performance of the Judd–SDR contracts. The collective bargaining agreement has no relevance to the issue of their standing as subcontractors under the statute because it was not an agreement to work at the Parkview at Woodlawn site. The agreement to do work at that site arose from their individual employment with SDR. *See Bethlehem Steel,* 296 Md. at 547–48, 463 A.2d 858 ("Accordingly, each electrical worker employed by Mid–States at Bethlehem was a subcontractor as defined in the Act, because each had a contract with someone,

other than the owner, for doing work for or about the 'building.' ").

Although appellees may have been employees of a subcontractor, there were individual agreements, whether by writing, or by word of mouth, or implied by conduct, between appellees and SDR. *See Bethlehem Steel,* 296 Md. at 546–48, 463 A.2d 858. Pursuant to these agreements, appellees agreed to furnish labor in the construction of a building, and SDR, who was not the owner or the owner's agent, agreed to pay them to do so. When SDR failed to do so, it became liable to its employees because the employees had rendered services. We hold that appellees had standing as subcontractors pursuant to the statute.

■ This case is complicated by the fact that Judd paid SDR for the work that had been completed, and SDR executed a release of mechanic's lien purporting to release Judd and the project from both its claims and the claims of its employees:

> NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, in payment of invoices or applications dated through 123198, the undersigned does hereby waive and release any and all liens or claims of right of lien on the aforementioned property and improvements now or hereafter assertable thereon for and on account of labor, materials, services and equipment furnished for said Project through 123198 (the "Release Date"). Further, the undersigned hereby waives and releases any and all claims, demands, liens, or right(s) or action, whether legal or equitable, against the above Project, said Subcontractor, Judd Fire Protection, Inc., any payment bonds or sureties, and the Project Owner, for and on account of all labor, materials, services and/or equipment furnished by or through the undersigned for said Project through the Release Date.
>
> IN CONSIDERATION of the payment sought hereby, the undersigned respectfully warrants that all material, labor, services and/or equipment used by the undersigned or

its sub-subcontractors, suppliers or materialmen for the Project through the Release Date hereof have been paid for in full, including taxes of every description, and that none of such sub-subcontractors, suppliers or materialmen is or will be entitled to claim or assert any claim or lien against the aforementioned Project including the property and improvement thereof, said subcontractor, Judd Fire Protection, Inc., any payment bonds or sureties of the Project Owner.

FURTHER, the undersigned shall hold harmless, protect and indemnify Judd Fire Protection, Inc., said Subcontractor and the Project against any claim, demand, lien or right of action, whether legal or equitable, that has accrued or may accrue as respects the labor performed or materials, services or equipment supplied by or through the undersigned through the Release Date, including any guarantees or warranties.

SDR accepted payment for services to date and represented to Judd that its employees had likewise been paid in full and could claim no lien against the project.

As a result, we are faced with competing equities between those who do work improving real property to be paid for their efforts and a party who has met its contractual obligations and obtained a release from its subcontractor. No case law in Maryland directly controls the outcome of this conflict, but the longstanding policy of this State is that

[t]he mechanic's lien law has historically been construed "in the most liberal and comprehensive manner in favor of mechanics and materialmen." Indeed, the law itself provides that it is remedial and is to be construed to give effect to its purpose. The need for a liberal construction is particularly important with respect to subcontractors who, though benefitting the owner and enhancing the value of the owner's property by the provision of their labor or materials, have no direct contractual relationship with the owner and therefore cannot otherwise subject the owner's property or assets to the payment of their claims.

*Winkler Constr. Co. v. Jerome*, 355 Md. 231, 246, 734 A.2d 212 (1999) (citations omitted). We conclude that the purported release did not deprive appellees, who were not parties to the release, of their right to a mechanic's lien.

This conclusion is consistent with the holdings of the courts of other states. For example, the Supreme Court of Virginia has held "that subcontractors and materialmen are not deprived of their independent liens unless they expressly waived their lien rights or expressly accepted, or by clear implication, agreed to be bound by the general contractor's stipulation in the general contract against liens." *VNB Mortg. Corp. v. Lone Star Indus., Inc.*, 215 Va. 366, 371–72, 209 S.E.2d 909, 914 (1974). *See also United Masonry, Inc. v. Riggs Nat'l Bank*, 233 Va. 476, 483, 357 S.E.2d 509, 513–14 (Va.1987) (noting that the applicable statute also requires consideration in exchange for a release or waiver of a mechanic's lien). In addition, "Colorado courts allow waiver only by express agreement of the party in whose favor the lien exists, by 'language clearly indicating an intention to waive a lien.'" *General Growth & Development v. A & P Steel, Inc.*, 678 F.Supp. 243, 245 (D.Colo.1988) (quoting *Bishop v. Moore*, 137 Colo. 263, 323 P.2d 897, 898 (1958)).

We hold that, unless the potential lienholders for labor individually waive or release their rights to a lien expressly or by clear implication, their right to a lien is maintained and cannot be released by a third party. SDR's release did not waive or release a right to a mechanic's lien on behalf of its employees.

Although the result may seem harsh, it comports with the remedial purposes of the statute and is not so draconian as to raise issues of fundamental unfairness. Potential lienholders must act quickly to maintain their rights, RP9–104(a), so that the owner or contractor is not liable for the foreseeable future for claims by subcontractors' employees to whom it was not responsible in terms of payment of salary, benefits, and the like. In addition, the owner and the contractor have an opportunity to protect themselves. For example, Judd "could

have required a performance bond or they could have withheld payment until [it was] satisfied all laborers and materialmen had been paid." *Diener*, 259 Md. at 563, 270 A.2d 471.

## II. The Measure of Damages

■ The trial court measured damages based on appellees' hourly wages rather than upon the contract price. This resulted in a total of $18,772.28 in damages that Judd was required to pay. Judd, on the other hand, made the following calculations of money due based on the $17 per head price agreed upon by SDR:

| Contract Number | % Complete | Total Due |
|---|---|---|
| #98-11428-1st Floor | @ 85% | 3,092.30 |
| #98-11429-Attic | @ 85% | 2,601.00 |
| Attic 6 Heads | @ 17.00 ea | 102.00 |
| #98-11430-2nd Floor | @ 85% | 3,092.30 |
| #98-11431-3rd Floor | @ 0% | 0.00 |
| *Subtotal Before Deductions Below* | | $8,887.60 |

| Less Insurance Costs | (1,258.91) |
|---|---|
| Less Attorney Consulting Fees | (385.00) |
| Less Previous Payment | (1,500.00) |

| | SUMMARY | |
|---|---|---|
| | Total Contract Values | $8,887.60 |
| | Less Deductions | -3,143.91 |
| | TOTAL DUE | $5,743.69 |

There is obviously a substantial difference between appellees' hourly wages and the contract price.

In their brief, appellees argue that, according to *Diener*, 259 Md. at 561, 270 A.2d 471, "it is the *reasonable value* of the

services performed by SDR employees on the Woodlawn project that is the proper measure of relief under the Maryland Mechanics' Lien statute." Appellees state in their brief that

> [h]ere, as in *Nat'l Elec. Indus. Fund v. Bethlehem Steel,* *supra,* the agreed upon price for labor is to be determined pursuant to "... the terms of each worker's employment ... found in the collective bargaining agreement." 296 Md. at 552, 463 A.2d at 863. Judd's error is simply in attempting to substitute *its* contract with SDR in lieu of the employees' collective bargaining agreement as the reasonable measure of "the price agreed upon for labor" between SDR and its employees.

(Emphasis in original).

The appellees, however, have neglected the clear statement in *Diener* concerning the proper measure of damages where a contract establishing the price for labor or materials is involved:

> Reasonable value, then, is the measure of damages, but **the contract price can be used in determining what those damages are.** We are in agreement with those authorities which hold that while the contract is not binding on the owner, **the contract price is nonetheless prima facie proof of the reasonable value, and the owner has the burden of introducing evidence to show unreasonableness.** In *Lanier v. Lovett,* [25 Ariz. 54, 213 P. 391 (1923) ], the Arizona court said at page 63, 213 P. at page 394:
>
>> 'The price agreed upon for labor or materials between a subcontractor and the contractor, is, *prima facie,* the reasonable value, and if a contract is entered into for a specific sum for labor or material, and is complete within itself, a detailed statement of the account is unnecessary.' Quoting from 18 R.C.L. 938, s 71.

A similar statement can be found in Phillips, [*A Treatise on The Law of Mechanics' Liens on Real & Personal Property* ] at § 204 [2d ed. 1883]:

'The owner, when the contract is not made immediately by himself or his duly authorized agent, but by his contractor, may show that the price agreed to be paid by the contractor was beyond the fair market value at the time; but, if there is no evidence to show that the materials furnished by a sub-contractor are worth less than the price agreed on between him and the principal contractor, he is entitled to a lien for this agreed price. The owner, when sued by a subcontractor, would be able to impeach the contract only for fraud or mistake. The contract in either case is admissible in evidence.'

In addition, see [10] Thompson,[*Commentaries on the Modern Law of Real Property*, § 5215 (1957) ]. In the case before us the appellants are liable for the contract price because there was no evidence whatsoever that it was unreasonable. However, **if it is any consolation to the appellants the contract price is a ceiling upon the lien claim.** *Bangor Roofing v. Robbins*, [151 Me. 145, 116 A.2d 664 (1955) ].

*Diener*, 259 Md. at 561–62, 270 A.2d 471 (emphasis supplied).

██ Appellees seek to extend the holding of *Bethlehem Steel* to circumvent the effect of *Diener* on their case, but *Bethlehem Steel* is essentially a standing case. We believe *Diener* applies to this situation and hold that, in the absence of fraud or mistake, the contract price is presumed to be the reasonable value of the services. As explained by the court in *Bangor Roofing & Sheet Metal Co. v. Robbins Plumbing Co., Inc.*, 151 Me. 145, 148–49, 116 A.2d 664 (Me.1955):

When by express contract the parties fix the compensation to be paid for full and complete performance of the contract, they have themselves established the debt to be secured by lien. In a sense they have by binding agreement determined the extent to which the owner's property will be enhanced by the labor and materials to be incorporated in the realty, and to that extent the contractor is protected by lien. When, as here, the owner is not party to the contract, the determination must be as to what is the fair and

reasonable value of the labor and materials in place. In what amount has the property been enhanced by the labor and materials furnished? Where, as here, the subcontractor has a fixed price contract with another contractor who stands between him and the owner, we think the price agreed upon represents a ceiling upon this fair and reasonable value, and it would be inequitable to permit a lien in excess of the subcontract price.

Here, the appellees only presented evidence concerning their hourly wages. Judd's owner, Frederick Judd, testified that it was standard in the industry to subcontract for sprinkler work with payment to be made on a per-head basis. There was no evidence that $17 per head was an unreasonable price for labor under the contract or that the agreement was the result of fraud or mistake.

We recognize that there is a $9,834.68 difference between the flat contract price of $8,887.60 for the work actually completed and the apparent hourly wages earned by appellees in this case. We also note that there appeared to be some dispute as to how much work appellees had in fact completed at the job site. Ramsey testified that SDR had completed all of the work on the first and second floor and the attic except the "hydro," although it was not explained what this was. Ramsey also testified that SDR had completed 55–60% of the work on the third floor. The appellees did not address how much of the work had been completed when they walked off the job.

Clearly, Ramsey's testimony conflicts with Judd's letter to SDR stating that 85% of the work had been done on the first and second floors and the attic and that no work had been completed on the third floor. On remand, the trial court should undertake an analysis of exactly how much work had been completed in accordance with the contract between Judd and SDR. Because SDR accepted these figures as accurate when it accepted payment for the work and signed the lien release, the burden of proof is on appellees. If the trial court finds that Judd's figures are inaccurate, it should adjust the

damage award appropriately using the $17 per head figure contained in the Judd–SDR contracts. The reasonable value of the services would not exceed the contract amount. Accordingly, we remand this case for recalculation of the damages to be paid to appellees.

### III. Offset from Restitution Orders

Judd's final argument is that the trial court erred in assigning to Judd the following judgments obtained by some of the appellees: Michael Anthony Green received a civil judgment against Ramsey for $2,100; John Hodge received a restitution order of $1,700; and Anthony Scott Woods received a restitution order of $2,200. Judd argues that the damage awards to appellees should have been reduced by the amount of their restitution orders. Judd, however, cites no case law in support of this proposition.

As this Court recently stated in *Electronics Store v. Cellco,* "it is not this Court's responsibility to attempt to fashion coherent legal theories to support appellant's sweeping claims." *Cellco,* 127 Md.App. 385, 405, 732 A.2d 980, *cert. denied,* 356 Md. 495, 740 A.2d 613 (1999) (noting that appellant "devotes only nine lines to [two of the counts in the brief], citing no law and only one record citation"). Similarly, appellant's argument in *Anderson v. Litzenberg,* 115 Md.App. 549, 577–78, 694 A.2d 150 (1997), was "completely devoid of legal authority." Thus, this Court stated that it "is not our function to seek out the law in support of a party's appellate contentions. Accordingly, we shall not address the potential merits of [the argument]." *Id.* at 578, 694 A.2d 150; *see also Oroian v. Allstate Ins. Co.,* 62 Md.App. 654, 658, 490 A.2d 1321 (1985) (argument deemed waived because appellants cited no authority in their brief to support their position).

Nevertheless, in light of our holding regarding the proper measure of damages in this case, the trial court may wish to reconsider its decision on the assignment of these judgments.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND REMANDED FOR FURTHER ACTION IN ACCORDANCE WITH THIS OPINION.**

COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY APPELLEES.