943 A.2d 30

**HIMES ASSOCIATES, LTD.**

v.

**Eric A. ANDERSON.**

**No. 310 Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Feb. 29, 2008.

506

508

510

Devin J. Soolan, Jr. and Robert C. Gill, Baltimore, MD, for Appellant.

Daniel J. Mellin (Hillman, Brown & Darrow, PA, on the brief), Annapolis, MD, for Appellee.

Panel: HOLLANDER, SALMON and DEBORAH S. EYLER, JJ.

DEBORAH S. EYLER, Judge.

In a bench trial, the Circuit Court for Anne Arundel County ruled in favor of Eric Anderson, the appellee, in his suit against his former employer, Himes Associates, Ltd. ("Himes"), the appellant, for breach of contract and violation of the Maryland Wage Payment and Collection Law, Md.Code (1957, 1999 Repl. Vol., 2007 Cum. Supp.), sections 3–501 et seq. of the Labor and Employment Article ("LE"). The court awarded Anderson treble damages of $98,521 as well as $7,974.49 in attorneys' fees and costs.

On appeal, Himes presents five questions for review, which we have rephrased as follows:

I. Did the circuit court lack personal jurisdiction over Himes?

II. Did the circuit court err in ruling that Himes, a Virginia corporation, is subject to liability under the Maryland Wage Payment and Collection Law?

III. Did the circuit court err by assigning the burden of proof to Himes?

IV. Did the circuit court err by applying an incorrect legal standard in reviewing Himes's decision to terminate Anderson for cause?

V. Did the circuit court err in finding that the parties did not have a "bona fide dispute," under the Maryland Wage Payment and Collection Law?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

Himes is a Virginia corporation with its principal place of business in Fairfax. It also has an office in Chicago, Illinois. It is a construction management company.

Anderson was hired by Himes on April 27, 2001. That day, Himes sent a written employment agreement ("Agreement") that it had drafted to Anderson at his home in Annapolis. The Agreement stated that Anderson would be an executive project manager and potentially the Vice President of Operations of Himes's Fairfax office. Anderson executed the Agreement shortly after he received it. The Agreement addressed, among other things, the issue of severance pay upon termination of employment. It stated, in relevant part:

*Severance:* If your employment is terminated by Himes Associates, Ltd. for reasons other than performance or cause, you will receive a) three months notice of termination or b) salary continuation for three months from the notice date. This option will be at the sole discretion of Himes Associates, Ltd.

Himes terminated Anderson's employment on March 25, 2004. That day, Paul Himes, the company's president and founder, called Anderson into his office late in the afternoon, told him that he was being terminated immediately, and gave him a signed letter of termination. Another employee then accompanied Anderson to his desk to gather his belongings and escorted him out of the building.

On November 18, 2005, in the Circuit Court for Anne Arundel County, Anderson sued Himes for breach of contract and violation of the Maryland Wage Payment and Collection Law ("the MWPCL"). The case came on for a trial to the court on March 28, 2007. Anderson's theory of prosecution was that he was not terminated for cause or performance, and therefore was entitled to three months' severance pay under the Agreement; and that Himes had wrongfully refused to pay him that sum when there was no bona fide dispute between the parties over whether the sum was due and owing. Himes's theory of defense was that Anderson had been termi-

nated based upon four incidents, which constituted bad performance or cause under the Agreement, and therefore was not entitled to three months' severance pay; and in any event, there was a *bona fide* dispute between the parties over whether that severance pay was due and owing.

Anderson testified on his own behalf and introduced numerous exhibits into evidence, including the Agreement, the termination letter, and the Himes Policy Manual. According to Anderson, Paul Himes told him on the afternoon of March 25, 2004, that he was being terminated because his position was being eliminated. This was a complete surprise to him, and he was shocked by it. Paul Himes handed him a termination letter, which stated that he would receive one week's severance pay pursuant to the Himes Policy Manual. Anderson told Paul Himes that his Agreement included a provision giving him three months' severance pay unless he was terminated for bad performance or cause. Mr. Himes responded that, if that was the case, then he would find cause for the termination. During his tenure at Himes, Anderson had not received any warnings or complaints about his job performance or conduct, however.

In response to being asked whether he remembered an incident in August of 2003 involving Karen Fields, Vice President of Business Development for Himes, Anderson testified that he only recalled the incident when it was brought up by Himes during the litigation. The incident was a single interaction he had with Fields in the Fairfax office in which he was "brusque" in talking to her but was not disrespectful and had not meant to be so. Nothing was said to him about the incident after it happened.

Anderson testified that he was assigned to several projects for Himes. The primary one was for Lockheed Martin, a Maryland corporation. Anderson was tasked with overseeing construction of a multimillion dollar Lockheed Martin building project in Virginia ("the Project"). In 2001, at Lockheed Martin's Baltimore office, Anderson had participated in presenting a proposal on behalf of Himes to manage the Project.

Lockheed Martin accepted the proposal. During the course of the Project, Anderson attended meetings twice a month at Lockheed Martin's Baltimore office. The general contractor on the Project was Davis Construction Company. James Davis, Jr., was the founder, President, and CEO of that company.

The contract between Himes and Lockheed Martin for the Project had an ending date in May 2004. An extension of the contract was going to be needed for Himes to complete its oversight work. Anderson testified that he was told by Paul Himes that it was his responsibility to speak to the Lockheed Martin people and get an extension of that contract. The person Anderson dealt with at Lockheed Martin was Charlie Clampitt. He spoke to Clampitt many times about an extension of the contract and felt confident that the extension was going to be granted. The extension had not been granted by the time he was terminated, however.

Anderson testified that part of his job as the manager for the Lockheed Martin Project was to hold the general contractor's (Davis's) "feet to the fire" so the Project would b e timely completed. Most of Himes's contracts to manage construction projects were with owners, as the Lockheed Martin contract was, and so it was expected that Himes's role would be to put pressure on the general contractors, on behalf of the owners.

In early 2004, Himes also had contracted with another Maryland company, Medimmune, to arrange and coordinate its relocation from five buildings to one building, all within the Gaithersburg area in Maryland. The project manager for that job was Condit McGeown. The move was to take place over three days, from Friday, March 12, through Sunday, March 14, 2004. Anderson was to cover part of the project by being present at a particular building involved in the move on the night of Friday, March 12. When he realized he could not be there, he arranged for his son John to take his place, which was acceptable to McGeown. According to Anderson, his son in fact took his place on that Friday night, as expected.

A series of e-mails between Paul Himes and Anderson, on March 30 and 31, 2004, was admitted into evidence. The correspondence began with Anderson asking to be sent a copy of Himes's Timesheet and Expense form to submit for processing. In response, Paul Himes made a proposal to Anderson to continue employment with Himes for an additional two months, until May 31, 2004, for the sole purpose of supporting Himes on the Lockheed Martin Project through the end of April, and then on a week-by-week basis, as determined by Himes, with severance "equal to one full months [sic] pay beyond that last week in which you performed services for Himes." In a follow-up email, Paul Himes said that he needed to hear from Anderson right away because he had spoken to Charlie Clampitt and "[h]e very much would like to see you continue on the [P]roject."

In Anderson's email response, he said that he needed clarification about his severance pay. Under the Agreement, he was entitled to three months' severance pay, as he had been terminated because his position was being eliminated; and he wanted Paul Himes to confirm that. Mr. Himes never confirmed that, and Anderson did not accept the proposal that he return for two months' employment and one-month severance pay.

In his testimony, Anderson explained that, in addition to the Lockheed Martin Project for which he attended meetings twice a month in Baltimore, he worked on the Batelle Memorial Institute Project in Aberdeen, Maryland.

Testifying for Himes were Paul Himes; Fields; McGeown; and Davis. Paul Himes stated that he terminated Anderson based on performance and cause. There were two performance issues. First, Anderson had not obtained an extension of Himes's Lockheed Martin contract during the period January through March, 2004, when he was supposed to accomplish that. Second, with respect to the Medimmune move, he was informed by McGeown that Anderson had arranged to have his son John cover his presence at one of the buildings during the move but his son never showed up. He also terminated

Anderson for cause, based upon Anderson's August 2003 run-in with Karen Fields. Fields had told him, at the time it happened, about a conversation in which, according to her, Anderson was combative and angry and acted offensively toward her, in front of other employees. Paul Himes testified that he did not talk to Anderson about the incident or take any action based upon it, however, because Fields asked him not to. Finally, he terminated Anderson based upon a telephone conversation he had with Davis not long before the termination date. That conversation, which is discussed *infra*, was the "straw that broke the camel's back."

According to Paul Himes, at his March 25, 2004 meeting with Anderson, he told Anderson he was being terminated for the way he was treating people. He specifically referred to the incident involving Fields and to Davis's telephone complaint. He did not review the Agreement prior to meeting with Anderson. When he gave Anderson the termination letter, Anderson said that he had an Agreement that called for him to receive three months' severance pay. Mr. Himes told Anderson he would review the Agreement and "if indeed I felt like that was something we should do or honor, that I would honor that provision."

Fields testified that, in the summer of 2003, she spoke to Anderson on the telephone about her frustration over his not doing more to develop new business from existing accounts. He became angry and did not take what she was saying well. The conversation was heated. A few days later, she went to Anderson's cubical, which was situated in the open space of the office, as all the cubicles were, to discuss the same thing. He became "combative and angry with [her], for challenging his authority...." She found his conduct in front of other employees "offensive." Fields further testified that she had solicited Lockheed Martin as a client and was unhappy with Anderson's failure to get an extension of the Lockheed Martin Project contract. A two-month extension was necessary to get all of the work done. In February 2004, she told Anderson and Paul Himes that the extension needed to be obtained.

Before Anderson was terminated, Fields spoke to Paul Himes about the fact that the termination was about to happen. She expected that Anderson would be terminated based on inadequate performance for failing to obtain a contract extension for the Lockheed Martin Project.

McGeown testified that she was the project manager for the Medimmune relocation contract, which called for a number of employees and laboratories to be moved out of five buildings and into one, over the course of a three-day weekend in March 2004. She explained that Anderson was supposed to cover one of the buildings on Friday night, March 12, but arranged for his son John to do it instead, because he could not. She had no problem with that. However, John Anderson did not show up that night. She was present at the site and knows for a fact that he did not show up. She let Paul Himes know about that situation.

Davis testified that because Davis Construction Company was the general contractor on the Lockheed Martin Project, he and his employees worked with Anderson, who was acting for Himes as the owner's representative. Davis's company and Himes have a multi-decade history of working together on projects. There came a time when he made a telephone call to Paul Himes about Anderson's performance on the Lockheed Martin Project. The call was in the spring of 2004. Davis testified as follows about that call:

I called Paul because our team was having difficulty in just conducting the business of building the [P]roject. And I called Paul and said, look, I think your man Eric is being difficult, this has been very, very difficult and frankly this is out of character with the relationship that our company has had with you Paul and with your company over these years and I think Paul, you need to look into it.

According to Davis, that was the only time he had ever complained to Paul Himes about a Himes employee.

Anderson called his son John in rebuttal. John Anderson testified that he had gone to the site of the Medimmune move on Friday, March 12, 2004, at 5:00 p.m. He interacted with

several people associated with Himes. He stayed until 11:00 p.m., when he was told by a Himes person that he could leave. He never put in a time sheet, however, and was not paid for his time.

After closing arguments, the court ruled from the bench, finding in favor of Anderson on both counts and awarding damages as recited above. The court's ruling was as follows:

I have looked over the trial memorandums. I have considered all of the testimony very carefully and I have also reviewed quickly, the exhibits that I think are the most important.

I would like to start out by simply telling you how they bear on my decision. I look at [the Agreement] and the only real relevant portion of that is ... [this] three line sentence. "If your employment is terminated by [Himes] for reasons other than performance or cause, you will receive (a) 3 months notice of termination or (b) salary continuance for 3 months from the notice date. This option will be at the sole discretion of [Himes]." That is what I need to figure into my analysis of how I feel about this case.

So it places the burden on Himes to convince me and I am still not sure what the standard is, but I have heard really no arguments or evidence as to what performance means. I have to use my discretion in deciding that and the term "cause." It has to fit into one of those categories and I think that burden is on [Himes] to convince the Court whether or not either of those terms would apply which would bring this case out of the severance package.

The severance is part of the contract. It is already in existence unless one of these two phrases or terms apply. And later on I will analyze my findings regarding those two issues. But I would point out that since [Himes] drw [sic] up this employment contract, basic contract law says that the drafter of a contract, if there is any terms that are vague, and not clearly pointed out, has to be resolved against the drafter of the document.

I think that is the law in this state as well as Virginia or any other state. My point being, Himes had an opportunity in this employment contract to state what performance problems would amount to that would cause a person to lose the severance package. And even probably easier to do, is what Himes ['s] idea of cause would be. Is it dishonesty on the work? Is it theft? Is it showing up intoxicated while you work. These are terms that the Court is anticipating when you are talking about cause. Terminating someone for cause.

Were they chronically late? Were they committing sexual harassment? There are terms that I think generally apply or theories that generally apply when you hear the word "cause." And Himes had an opportunity to lay those out in the contract that they drew up and unfortunately did not put any of that in there.

So I don't know, maybe Mr. Himes [sic] idea is different from [Anderson's] idea and may be different from my idea of what "cause" is. It is just an open ended term. And this is a large scale business ... I would hope that Mr. Himes had talked it over with his counsel before he offered this employment opportunity to [Anderson].

[Turning to the] employee policy manual. This is an 8 page document drafted again by [Himes] and it covers all kinds of minute [sic] things that really aren't before me today. Tuition assistance, in house job postings, health club dues, but there was never a definition of "cause." And you know, if an employee is to get one of these, it says, "employee's policy manual" you would think that if not mentioned in the employment contract, it would have been clearly mentioned in the policy manual. . . .

I then looked at the [the termination letter dated March 25, 2004], which I personally think is probably one of the most helpful documents to me in making my decision in this case. . . . It was handed to [Anderson] at the end of the work day when he was in fact, terminated. It was obviously prepared by someone prior to that meeting in the afternoon.

And it reads, "effective immediately, your employment with [Himes] is terminated." Absolutely no reason for the termination. It goes to you know, explain a lot of other things basically security issues that would benefit Himes, but it doesn't say why this man who has been with the company ... close to 3 years is being terminated after coming back from a vacation without stating a reason.

It just amazes me how a company that is so meticulous on a lot of other details, left that out or intentionally didn't put it in there and when I asked Mr. Himes about whether he had read the original employment contract before he fired [Anderson], he said no.

What I suspect happened here is, that Mr. Himes who is president and CEO of this company, did not think out his decision properly on March 25th. As I mentioned earlier, he didn't read the initial employment contract and he obviously didn't consider it in light of Mr. Clampitt's total satisfaction with [Anderson].

And when he realized that that may impact on one of his customers who is paying him a fee and he had two months to go to bill Mr. Clampitt, he said oh my god, what did I do? And his actions after that, a week later have kind of explained a lot of unanswered questions to the Court. Number 1, there couldn't possibly be any way a reasonable trier of fact could conclude that [Anderson] was terminated for job performance.

There is no way. There is no proof of it. There has been no proof that any of the annual evaluations were poor. We have a paying client who is totally satisfied obviously with [Anderson's] performance . . . .

And you know, this is a high pressure business. There are time limits, there are deadlines. This incident with Karen Fields, I think [Anderson's trial counsel] summarized it very, very accurately. This is a lot to do about nothing. It happened months before the firing. There was no reprimand. It was not even brought to [Anderson's] attention until after [Paul Himes] realized that hey, I have to come up

with some kind of cause or otherwise I am on the hook for this severance pay.

It is an afterthought and nothing more. And I want to comment on Ms. Field's testimony. I believed her. Asked why she didn't make a big deal out of this? "I spoke to Paul but I still wanted the relationship to work with [Anderson] and I wanted it to work out to make money."

That is what everybody seems to be motivated on [Himes's] side of this case. Making the money. For [Himes] to believe that any reasonable trier of fact would conclude on March 25th, his performance was bad. It is just remarkable. Because the proof is in the pudding. Why would you send someone out on a huge contract like Lockheed Martin if he wasn't performing correctly?

Now let's talk about cause. And I guess the cause, the only evidence is I have heard is the Karen Field incident which I have already chalked up to be a lot to do about nothing. But also the testimony regarding how he deals with the Davis people and how the Davis company and [Himes] have been doing business for over 20 years and how there were a lot of complaints.

Well isn't that why you hired him? I mean, you hired this man to get the job done. He is not always going to please people in the performance of his duties. So if he offended some egos, it sounds to me like he did nothing but perform his job . . . .

But it all boils down to whether or not he is entitled to the severance package. And I think that you probably can tell that I am convinced absolutely that he is entitled to the severance package. I don't believe that poor performance as a matter of fact, nor do I believe that cause existed that would excuse [Himes] from paying that severance package and unfortunately [Anderson] has gone a year and a half or so without having use of that money.

\* \* \* \*

There was absolutely nothing that would indicate that he shouldn't have at least been given some kind of notice. And

Mr. Himes, you are a good man, there is no question but I think you used very poor judgment in reference to this particular situation. You rolled the dice, quite frankly and you lost. . . . And at any point between the time you filed this claim or he filed this claim up until now, this case could have been resolved. I think very easily.

So I have to consider now, what other damages may be appropriate in this case.

The trial court went on to find that the case fell within the purview of the MWPCL. It paraphrased LE section 3–507.1(b) as follows: ". . . . and if an in action such as this, the Court finds that an employer withheld these wages in violation of this subtitle and not as a result of a bonafide [sic] dispute, the Court may award an amount not exceeding 3 times the wages plus reasonable counsel fees."

The court continued:

Now, you know, what dispute was there? [Anderson] . . . had no idea he was going to get fired. There were no preliminary indications or discussions, so I find that there was no bonafide [sic] dispute and I think that this provision of our law applies in this case because it is remedial. It is to send out a message that employers who write the checks can't just pick and chose [sic] when they are going to pay an employee when there is not a dispute, a bonafide dispute. And I don't believe there is.

I think that the dispute arose when you [referring to Paul Himes] basically tried to justify what you did on March 25th in hindsight. It just doesn't make sense to me and I think this is [a] clear example of how and why this section of the law applies.

As noted previously, the court concluded by awarding Anderson treble damages and fees.

We shall include additional facts as pertinent to our discussion of the issues.

## DISCUSSION

### I.

### *Personal Jurisdiction*

Within 60 days of being served, Himes filed a motion to dismiss under Rule 2–322, asserting, among other things, that the circuit court lacked personal jurisdiction over it. Anderson filed an opposition to Himes's motion and attached an affidavit in which he attested that he was employed by Himes on the Lockheed Martin Project (as was later brought out at trial) and that, as a Himes employee, he had "ongoing regular contacts and meetings at the site" of the Battelle Memorial Institute project in Aberdeen. Anderson attached other documents purporting to show that Himes had been registered with the Maryland Department of Assessments and Taxation from April 22, 1998, until November of 2000, when it forfeited its registered status by failing to file a "property return for 2000." Himes still maintained a resident agent in Maryland, however.

On February 28, 2006, the court denied Himes's motion to dismiss in a written order. Himes did not later re-raise the issue of personal jurisdiction.

On appeal, Himes contends that "the circuit court erred in exercising personal jurisdiction over [Himes], a Virginia employer." Himes argues that the court did not have general personal jurisdiction over it because Anderson never showed that Himes had "extensive, continuous and systematic" contacts with the State of Maryland as constitutionally required. *See Nichols v. G.D. Searle & Co.*, 783 F.Supp. 233 (D.Md. 1992), *aff'd*, 991 F.2d 1195 (4th Cir.1993). Further, Himes argues, any exercise by the circuit court of specific personal jurisdiction over it violated its constitutional right to due process because its "contacts with [Maryland] were minimal in nature and bore no relationship to [Anderson's] cause of action."

In arguing that it lacked the requisite minimum contacts with Maryland for a Maryland court to exercise personal jurisdiction over it, Himes draws from facts adduced at trial—

not just those presented to the motions court. It asks us to review the entire record and to hold that, based on the record evidence, the circuit court did not have personal jurisdiction over it at any time. In addition, Himes argues, it would violate "concepts of fair play and substantial justice" for the circuit court to exercise either general or specific jurisdiction over it.

Anderson challenges all of Himes's contentions. He maintains that Himes, indeed, had sufficient contacts with the State of Maryland for the trial court to exercise either general or specific personal jurisdiction over it.

■ Rule 8–131(a) states in pertinent part:

The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2–322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court. . . .

Because it filed a motion to dismiss for lack of personal jurisdiction under Rule 2–322, Himes did not waive that issue for appellate review. *See Presbyterian Univ. Hosp. v. Wilson*, 337 Md. 541, 548, 654 A.2d 1324 (1995) (noting that under Rule 8–131(a), "the issue of the jurisdiction of the trial court over a person may be reviewed as long as the party asserting a lack of jurisdiction has not waived this defense.").

■ In arguing lack of personal jurisdiction on appeal, Himes does not restrict its analysis to the facts presented in support of and opposition to the motion to dismiss. Rather, it refers to the undisputed or decided facts developed at trial, as relevant to personal jurisdiction, and maintains that those facts were legally insufficient to support a finding of general or specific jurisdiction. In his argument to the contrary, Anderson likewise does not limit his analysis to those facts that were before the circuit court on motion. A threshold question we must answer, then, is whether, in reviewing the issue of personal jurisdiction, we are confined to the evidence before the court on motion. We conclude that we are not.

We read Rule 8–131(a) to permit appellate review of the issues of personal jurisdiction (if not waived) and subject matter jurisdiction on the entire record. The main point of the first sentence of that rule is to confer on the Maryland appellate courts the discretion to decide either of those issues, even though they were not raised below, with the single caveat that the issue of personal jurisdiction cannot have been waived. (Indeed, the issue of subject matter jurisdiction may be raised by the appellate court *sua sponte*. *Lewis v. Murshid,* 147 Md.App. 199, 202–03, 807 A.2d 1170 (2002).) With respect to subject matter jurisdiction, for which there is no non-waiver requirement, review necessarily will encompass the entire record, because no motion need have been filed. With respect to personal jurisdiction, a motion need have been filed, to avoid waiver, but the broad grant of discretion to review "whether or not raised in and decided by the trial court" suggests that review of the issue is not limited to the record on motion. Indeed, the broad grant of discretion language would seem meaningless, in the context of personal jurisdiction, if the motion that need be filed so as to avoid waiver also had the effect of restricting the court's review. Accordingly, we shall review the issue of personal jurisdiction in this case upon the entire record, and not just upon the submissions made on motion.

■ Our standard of review is *de novo:* we decide "whether the trial court was legally correct" to exercise personal jurisdiction over Himes. *Bond v. Messerman,* 391 Md. 706, 718, 895 A.2d 990 (2006).

■ "Whether a court may exert personal jurisdiction over a foreign defendant entails dual considerations. First, we consider whether the exercise of jurisdiction is authorized under Maryland's long arm statute, Md.Code (1973, 2002 Repl. Vol.), § 6–103 of the Courts and Judicial Proceedings Article."[1] *Beyond Systems, Inc. v. Realtime Gaming Holding*

---

[1]. Section 6–103 of the Courts and Judicial Proceedings Article ("CJ") provides in pertinent part:

*Co., LLC,* 388 Md. 1, 14–15, 878 A.2d 567 (2005). Second, "the exercise of jurisdiction must comport with due process." *Mackey v. Compass Marketing, Inc.,* 391 Md. 117, 129–30, 892 A.2d 479 (2006). The Court of Appeals has construed Maryland's long-arm statute as authorizing "the exercise of personal jurisdiction to the full extent allowable under the Due Process Clause." *Bond, supra,* 391 Md. at 721, 895 A.2d 990. Accordingly, "our statutory inquiry merges with our constitutional examination." *Beyond Systems, supra,* 388 Md. at 22, 878 A.2d 567. The inquiry becomes whether the trial court's "exercise of personal jurisdiction over a nonresident defendant satisfies due process requirements if the defendant has 'minimum contacts' with the forum, so that to require the defendant to defend its interests in the forum state 'does not offend traditional notions of fair play and substantial justice.'" *Beyond Systems, supra,* 388 Md. at 22, 878 A.2d 567 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

■■■■■ If the defendant's contacts with the forum state do not form the basis for the plaintiff's suit, then personal jurisdiction, if it exists, "must arise from the defendant's general, more persistent contacts with the State." *Beyond Systems, supra,* 388 Md. at 22, 878 A.2d 567. To establish "general jurisdiction," the defendant's activities in the state must be shown to have been "'continuous and systematic.'" *Id.* at 22–23, 878 A.2d 567 (quoting *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.,* 334 F.3d 390, 397 (4th Cir.2003)); *see also Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 & n. 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). "If the defendant's contacts with the

(a) Condition.-If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.
(b) In general.-A court may exercise personal jurisdiction over a person, who directly or by an agent:
(1) Transacts any business or performs any character of work or service in the State;
(2) Contracts to supply goods, food, services, or manufactured products in the State;

forum state form the basis for the suit, however, [the plaintiff] may establish 'specific jurisdiction [over the defendant].'" *Beyond Systems, supra,* 388 Md. at 26, 878 A.2d 567 (quoting *Carefirst, supra,* 334 F.3d at 397). In deciding the existence *vel non* of specific jurisdiction, a court should consider "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Beyond Systems, supra,* 388 Md. at 26, 878 A.2d 567 (quoting *Carefirst, supra,* 334 F.3d at 397).

"[T]he quality and quantity of contacts required to support the exercise of personal jurisdiction will depend upon the nature of the action brought and the nexus of the contacts to the subject matter of the action." *Camelback Ski Corp. v. Behning,* 312 Md. 330, 338, 539 A.2d 1107, *cert. denied,* 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988). "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts." *MaryCLE, LLC v. First Choice Internet, Inc.,* 166 Md.App. 481, 504, 890 A.2d 818 (2006) (quoting *CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1267 (6th Cir.1996)).

In the past, when a contractual dispute was involved, in deciding the issue of specific jurisdiction, we have combined our consideration of the first two factors (whether the defendant "purposefully availed" itself of the state's benefits in conducting business and whether jurisdiction "arose" out of the cause of action), and have reasoned that the exercise of specific jurisdiction is proper when "the suit is based on a contract that has a substantial connection with the forum State." *Sleph v. Radtke,* 76 Md.App. 418, 428, 545 A.2d 111, *cert. denied,* 314 Md. 193, 550 A.2d 381 (1988). *See also McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (holding that exercise of specific jurisdiction is proper when the disputed "contract . . .

had a substantial connection with that State"). The mere residency of a party to the contract is not, by itself, sufficient for that State to assert jurisdiction. *See Burger King v. Rudzewicz*, 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Nor are "telephone calls and correspondence with the plaintiff in the forum state" alone sufficient to establish a substantial connection. *Bond, supra*, 391 Md. at 723–24, 895 A.2d 990.

When, however, the defendant has maintained a set of "continuing obligations" between himself and a resident of the forum state, he has "availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.'" *Sleph, supra*, 76 Md.App. at 428–429, 545 A.2d 111 (quoting *Burger King, supra*, 471 U.S. at 476, 105 S.Ct. 2174). In *Jason Pharmaceuticals, Inc. v. Jianas Bros. Packaging Co.*, 94 Md.App. 425, 435–36, 617 A.2d 1125 (1993), this Court upheld the exercise of specific personal jurisdiction over a Missouri purchaser who had contracted to buy goods from a Maryland supplier. The purchaser had initiated contact with the Maryland supplier, negotiated the contract over the course of weeks with the supplier, and sent a $35,000 down payment for the goods to Maryland. After receiving and testing the goods, the purchaser complained that they were defective and refused to make further payment on the contract. The seller brought suit in Maryland for breach of contract. On those facts, we held that the "cause of action arose out of" the purchaser's contacts with Maryland and the purchaser had engaged in sufficient purposeful activity in Maryland to justify the court's exercise of personal jurisdiction. *Id.*

Similarly, in *Presbyterian University Hospital v. Wilson, supra*, 337 Md. at 555, 654 A.2d 1324, the Court of Appeals upheld the exercise of specific personal jurisdiction in Maryland in a wrongful death action against a Pennsylvania hospital. The hospital had registered in the State of Maryland as a

transplant center accessible to Maryland residents. The decedent, a Maryland resident, died during a transplant operation at the hospital. His survivors brought suit in Maryland for negligence and breach of contract. The Court held that, by registering as a center accessible to Maryland residents, the hospital "was not only aware that Maryland patients would come to its facility, it placed itself in a position to purposefully attract such patients" and thereby "purposefully availed itself of the benefits conferred upon it by the State of Maryland." *Id.* at 555–56, 654 A.2d 1324. In its capacity as a transplant center, the hospital had numerous contacts with the decedent. It .had helped arrange for his travel to Pennsylvania for the operation and had contracted with him to perform the operation. These actions by the hospital, the Court reasoned, were "purposeful, voluntary contacts with the State of Maryland which are directly related to the present cause of action." *Id.*

In the case at bar, Himes does not argue that personal jurisdiction was improper under Maryland's long-arm statute. Its sole argument is that, due to a lack of minimum contacts, it was unconstitutional for Maryland to exercise personal jurisdiction over it. We disagree.

Himes entered into the employment Agreement with Anderson, a Maryland resident; and the Agreement contemplated a series of "continuing obligations" between the two, including Anderson's responsibilities as an employee and Himes's responsibilities as an employer. While the record is silent as to who first solicited whom for employment, it is undisputed that, on April 27, 2001, Himes drafted the Agreement and sent it to Anderson at his residence in Annapolis. In this sense, like the defendants in *Wilson* and *Jianas,* Himes purposefully initiated its contractual relationship with a Maryland resident. More important, however, as a Himes employee, Anderson was required to perform many of his duties in Maryland. The trial court credited Anderson's testimony that his primary job responsibility was to supervise the Lockheed Martin Project, which entailed his traveling twice a month to Baltimore to meet with Lockheed Martin employees.

He also performed work on the Batelle Memorial Institute project in Aberdeen and the Medimmune project in Gaithersburg.

The dispute as to whether Himes breached the Agreement by not paying Anderson three months' severance was substantively connected to Anderson's employment activities in Maryland. One of the four ostensible reasons that Himes gave for terminating Anderson for poor performance or cause was his failure to obtain an extension from Lockheed Martin of its contract with Himes. Anderson's primary contact person with Lockheed Martin, from whom he solicited the contract extension and with whom he would meet twice a month in Baltimore, was Charlie Clampitt. It was Himes's position that Anderson failed to perform employment duties that he should have accomplished in his dealings with Clampitt, which were in Maryland. Also, Himes maintained that Anderson performed his work poorly by failing to fulfill his obligations on-site at the Medimmune project in Gaithersburg.[2] By employing Anderson in a capacity that required him to engage in work not only in Virginia but also in Maryland, Himes purposefully availed itself of the privilege of doing business in Maryland; moreover, Anderson's cause of action against Himes arose out of the Agreement that was, at least in part, performed in Maryland, and concerned Anderson's failure *vel non* to properly perform work in Maryland.

Turning to the third prong of a specific jurisdiction analysis, "whether the exercise of personal jurisdiction

---

**2.** It is undisputed that at all relevant times Anderson was acting as an agent of Himes. Therefore, his contacts with the State of Maryland (and the contacts of the other Himes corporate agents who testified about working on projects in Maryland) are imputed to Himes. "[T]he Supreme Court has not expressed any doubt that the acts of corporate agents may be attributed to a corporation for purposes of determining whether personal jurisdiction is proper over the principal." *Mackey, supra,* 391 Md. at 126, 892 A.2d 479. *See also Int'l Shoe, supra,* 326 U.S. at 316–19, 66 S.Ct. 154 (holding that, because "the corporate personality is a fiction," whether a corporation's contacts with a forum are sufficient to subject it to suit in that forum is determined by reference to the "activities carried on in its behalf by those who are authorized to act for it").

would be constitutionally reasonable," Himes argues that subjecting it to personal jurisdiction in Maryland offends "traditional notions of fair play and substantial justice." To determine whether the exercise of personal jurisdiction would be constitutionally unreasonable and thereby offend traditional notions of fair play and substantial justice, we consider: "the burden on the defendant; the interests of the forum State; the plaintiff's interest in obtaining relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversy; and the shared interest of the several states in furthering fundamental substantive social policies." *Camelback, supra*, 312 Md. at 342, 539 A.2d 1107 (citing *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 107, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)).

In the case at bar, the trial court's exercise of jurisdiction over Himes was not constitutionally unreasonable. The record shows that Himes conducted significant business with Maryland-based clients. Its employees frequently entered Maryland to conduct on-site supervision of projects. Maryland has a significant interest in protecting the rights of its residents to receive payment under employment contracts performed at least in part in Maryland. Himes has presented no compelling argument regarding the necessity of Virginia retaining sole jurisdiction over this case. Accordingly, we conclude that the circuit court had specific personal jurisdiction over Himes.[3]

## II.

### *Is Himes, a Virginia employer, subject to liability under the Maryland Wage Payment and Collection Law?*

Himes further contends that the trial court erred in holding that it is subject to liability under the MWPCL. Specifically, Himes argues it is not an "employer" as that term is defined, in relevant part, in LE section 3–501(b): " 'Employer' includes

---

3. Because we find that the circuit court had specific personal jurisdiction over Himes, we need not address the question of whether it also had general jurisdiction over Himes.

any person who employs an individual in the State...."
Himes argues that the MWPCL was enacted solely to extend
liability to *Maryland* employers, and because it is a Virginia
corporation and Anderson was hired to eventually run its
office in Virginia, Anderson was never employed as "an indi-
vidual in the State" of Maryland for purposes of the MWPCL.

To support its statutory interpretation, Himes points to the
Maryland Department of Labor, Licensing, and Regulation's
("DLLR") *Maryland Guide to Wage Payment and Employ-
ment Standards* ("the *Maryland Guide*"), a pamphlet pro-
duced by DLLR to help Maryland employers and employees
understand Maryland's wage laws. The *Maryland Guide*
provides the following guidance about the jurisdictional limits
of the MWPCL:

> **Note on Jurisdiction**
>
> Claims for unpaid wages must be brought in the state in
> which the work was performed. If work was performed in
> more than one state, claims may generally be filed in the
> state in which the employer maintains its business office—
> that is, the office where the employee reports to or was
> hired out of.

Himes maintains that, even if Anderson in fact performed
some work in Maryland for Himes, under the *Maryland
Guide's* provisions, he should have filed suit in Virginia, not
Maryland.[4]

Himes further urges this Court to analyze whether it is
subject to liability under the MWPCL by reference to certain
factors this Court considered in *Hodgson v. Flippo Const. Co.
Inc.*, 164 Md.App. 263, 268–74, 883 A.2d 211, *cert. denied*, 390
Md. 285, 888 A.2d 342 (2005), in determining whether an
employee is "regularly employed" for purposes of Maryland's
Workers' Compensation Act, LE section 9–101 *et seq.*[5]

---

4. Virginia's wage payment law, codified at Va. Ann.Code, section 40.1–
   29, allows only for administrative action and, unlike the MWPCL, does
   not create a private right of action.

5. In advancing this argument, Himes relies upon an unreported opinion
   of a magistrate judge in the United States District Court for the District

Anderson disagrees and argues that the statute's plain language compels this Court to conclude that he was "employed as an individual" in Maryland, thus making Himes an employer subject to liability under the MWPCL. He maintains that workers' compensation cases are not analogous because workers' compensation "is clearly a legally distinct cause of action where the specific location of the work-related accident is the primary consideration. . . ." Anderson points to a number of connections between his employment by Himes and the State of Maryland, including his assistance with the Medimmune project in Gaithersburg and the Batelle Memorial Institute project near the Aberdeen Proving Grounds, and his regular meetings at Lockheed Martin's Baltimore office as part of his work on the Lockheed Martin Project.

Our primary goal in construing a statute is to ascertain the legislature's intent. *Clipper Windpower v. Sprenger*, 399 Md. 539, 553, 924 A.2d 1160 (2007). "If the statutory language is clear and unambiguous, we need not look beyond the statute to determine the Legislature's intent." *Stachowski v. Sysco Food Services of Baltimore, Inc.*, 402 Md. 506, 516, 937 A.2d 195 (2007). If the language of the statute is ambiguous, we determine the legislative intent by considering the common meaning of the statute's language, any legislative history, and the objectives and purpose of the statute. *Stoddard v. State*, 395 Md. 653, 662, 911 A.2d 1245 (2006). A statute is ambiguous when "two or more reasonable interpretations" exist. *Id.* (citing *Chow v. State*, 393 Md. 431, 444, 903 A.2d 388 (2006)). When a statute's language is ambiguous, we will give some deference to "a consistent and long-standing construction given a statute by an agency charged with administering it." *Stachowski, supra*, 402 Md. at 517, 937 A.2d 195 (citing *Marriott Employees Federal Credit Union v. MVA*, 346 Md. 437, 445, 697 A.2d 455 (1997)). Whether the language

---

of Maryland, *Martinez v. Holloway*, No. Civ. A. DKC–03–2118, 2005 WL 3157945 (D.Md.2005) (applying *Hodgson* factors to determine that, when an employer hired his employees in Maryland but all their work was performed in Pennsylvania, the employer was not subject to liability under the MWPCL).

of a statute is ambiguous is a question of law that we review *de novo.* *See Moore v. State,* 388 Md. 446, 452, 879 A.2d 1111 (2005) (issues of statutory construction are subject to *de novo* review).

■ In this case, we begin the process of determining the General Assembly's intent by examining the language of the statute to determine whether it plainly means being "employ[ed]" "in the State" of Maryland encompasses being assigned to work on projects that require the employee, from time to time, to attend meetings and be physically present in Maryland. *See Baltimore Harbor Charters, Ltd. v. Ayd,* 365 Md. 366, 379, 780 A.2d 303 (2001). As noted above, in relevant part, LE section 3–501 defines "employer" to "include[ ] any person who employs an individual in the State...." The operative word in that sentence—"employs"—is defined in LE section 3–101: " '[E]mploy' means to engage an individual to work.... *'Employ' includes:* (i) allowing an individual to work; and (ii) *instructing an individual to be present at a work site."* (Emphasis added.)

The plain language of LE section 3–101 covers the situation in which a company outside of Maryland directs its employee to go to a work site in Maryland. There is nothing unclear about that language. The language directly applies to the evidence in this case about Anderson's work for Himes. That evidence showed that, as part of his function as a project manager for Himes for the Lockheed Martin Project, Anderson had to attend meetings twice a month at Lockheed Martin's Baltimore office, in the State of Maryland. On that evidence alone, Himes was an "employer" under the MWPCL, and therefore was subject to liability for violating it.

■ The DLLR's "Note on Jurisdiction," stating that when work has been performed in more than one state "claims may generally be filed in the state in which the employer maintains its business office[,]" cannot alter the plain meaning of the language of the controlling statute or its application to the evidence in this case. When statutory language is unambiguous, we will not defer to an agency's differing interpretation of it. *See Marriott, supra,* 346 Md. at 446, 697 A.2d 455

(agency's construction of the statute "is not entitled to deference [ ] when it conflicts with the unambiguous statutory language"). Moreover, the wording of the "Note on Jurisdiction" is not mandatory and does not wholly support Himes's position. The note states only that, when an individual has performed work in more than one state, his claim for unpaid wages *"may generally* be filed in the state where the employer maintains its business office." (Emphasis added). It does not *require* that such a claim be filed in the state where the employer keeps a business office. Thus, even under the DLLR's interpretation of the MWPCL, Anderson was not prohibited from filing his claim for unpaid wages in Maryland.[6]

We also reject Himes's invitation to apply to the issue of whether it is an "employer" under the MWPCL the factors relevant to whether an employee is "regularly employed" in Maryland within the meaning of the Maryland Workers' Compensation Act. If the legislature had intended the MWPCL to apply only to employers of those individuals who are "regularly employed" in Maryland, it could have said so. *Cf. Baltimore Harbor Charters, supra,* 365 Md. at 385, 780 A.2d 303 (employing the principle of *"expressio unius est exclusio alterius"* (the expression of one thing is the exclusion of another) to hold that if the General Assembly had intended to exclude administrative, executive, and professional employees from the MWPCL, it could have said so in the statute; because it did not, such individuals were covered employees under the MWPCL). Being "regularly employed" in Maryland is a higher standard than having been "instruct[ed] . . . to be present at a work site" in Maryland.

## III.

### *Burden of Proof*

In its ruling from the bench, the trial court determined that the burden of proof to show that Anderson was terminated for

---

6. We would also note that the *Maryland Guide* itself declares that it "should not be cited as legal authority," thus furthering limiting its value as an aid in statutory construction.

"performance or cause," and thus was not entitled to severance pay under the Agreement, was on Himes. Specifically, the judge stated that "the burden is on [Himes] to convince the Court whether or not either of these two terms would apply [to] bring this case out of the severance package."

Himes contends that the trial court's allocation of the burden of proof was legally incorrect. Citing *Towson Univ. v. Conte*, 384 Md. 68, 91, 862 A.2d 941 (2004), it argues that, in an action for breach of an employment contract, the burden is on the employee to prove that the employer's action was "arbitrary and capricious and not based on objectively reasonable evidence." It maintains that the trial court's error in assigning the burden of proof to it was prejudicial.

Anderson responds that the trial court did not err in placing the burden of proof on Himes to show that he (Anderson) was terminated for "performance or cause" and therefore was not entitled to the severance pay afforded by the Agreement. He cites *Tricat Industries, Inc. v. Harper*, 131 Md.App. 89, 119, 748 A.2d 48 (2000), for the proposition that, in an action for breach of an employment contract under which the employee only can be terminated for cause, "the burden of proving cause for termination is on the [employer]."

We review *de novo* the trial court's allocation of the burden of proof as a question of law. *See Walter v. Gunter*, 367 Md. 386, 392, 788 A.2d 609 (2002). If we find error, we only will reverse the judgment if the error caused prejudice. *Flores v. Bell*, 398 Md. 27, 33, 919 A.2d 716 (2007) (stating that "[t]he burden is on the complaining party to show prejudice as well as error").

Himes's reliance upon the holding in *Towson Univ. v. Conte, supra*, is misplaced. In that case, an employee of a university had an employment contract that allowed for his termination for "just cause." After the employee was discharged, he brought suit, alleging that his discharge had violated his employment contract because it had not been for "just cause." The Court's decision concerned the proper role and function of the fact-finder in such an action. It held that, in a just cause

**538**

employment contract case, the fact-finder is not to decide whether the factual basis for the termination actually occurred or whether it was proven by a preponderance of the evidence. Rather, the fact-finder's "proper role ... is to review the *objective* motivation, *i.e.*, whether the employer acted in objective good faith and in accordance with a reasonable employer under similar circumstances when [it] decided there was just cause to terminate the employee." 384 Md. at 85, 862 A.2d 941 (emphasis in original).

The Court reasoned that a fact-finder in such a case does not serve as a super-personnel officer, who can substitute his own determination of just cause *vel non* for that of the employer. In a just cause employment relationship, there is "a legal presumption that an employer retain[s] the fact-finding prerogative underlying the decision to terminate employment." *Id.* at 89, 862 A.2d 941. "[I]n the just cause employment context, a [fact-finder's] role is to determine the *objective reasonableness* of the employer's decision to discharge, which means that the employer act in objective good faith and base its decision on a reasoned conclusion and facts reasonably believed to be true by the employer." *Id.* at 91, 862 A.2d 941 (emphasis in original).

The trial court in *Conte* had placed the burden of proving just cause to terminate the employment contract on the employer. On review, the Court of Appeals expressly did *not* address the question whether that decision—*i.e.*, the proper assignment of the burden of proof—was legally correct. It pointed out, in a footnote, that that question was not contained in the petition for *certiorari* and therefore was not before it. 384 Md. at 75 n. 3, 862 A.2d 941. It recognized that the issue it actually was deciding—the proper role and function of the fact-finder in a just cause breach of employment contract case—was not a burden of proof issue. On that ground, it noted that *Tricat Industries v. Harper, supra*, indeed addressed the burden of proof issue. Thus, *Conte* does not support Himes's argument that the trial court in the case at

bar erred by assigning to it the burden of proof to show "performance or cause" for Anderson's termination.

In *Tricat*, an action brought by a terminated employee on a just cause employment contract, the employer argued on appeal that the trial court had erred by instructing the jury that the burden of proving that the employee was terminated for just cause was on it. We held that the court's instruction was not in error. We applied, by analogy, the holding of the Court of Appeals in *Foster–Porter Enterprises v. De Mare*, 198 Md. 20, 29, 81 A.2d 325 (1951). In that case, a dispute between a manufacturer and a distributor as to whether the manufacturer had the right to terminate the distributorship agreement because of a breach by the distributor, "[t]he Court of Appeals held that the burden of proof was on the defendant manufacturer and sustained the trial court's factual determination that the manufacturer had failed to prove a material breach of the distributorship agreement sufficient to justify termination." *Tricat, supra,* 131 Md.App. at 119, 748 A.2d 48. We concluded that, on the analogous issue of the proper assignment of the burden of proof to show cause for termination in an action for breach of a just cause employment contract, the burden of proof is on the employer. *Id.*

We see no reason to depart from our holding in *Tricat* in the case at bar. To be sure, this case differs somewhat, in that it is not a wrongful termination case. Here, given that there was no term to Anderson's Agreement, Himes retained its right to terminate Anderson's employment for no cause. *See Judd Fire Protection, Inc. v. Davidson*, 138 Md.App. 654, 661 n. 5, 773 A.2d 573 (2001) ("[a]n [employment] agreement is deemed at-will, and thus terminable without cause, when it fails to specify a particular time or event terminating the employment relationship."). However, whether upon doing so it became obligated to pay three months' severance depended upon whether it had terminated Anderson for "performance or cause." Thus, the analogy to *Tricat* is close, and we shall apply that holding.

We note, moreover, that even if the trial court's assignment of the burden of proof to Himes was in error, the error did not cause prejudice to Himes. It is clear from its ruling from the bench that the trial court's decision in this case did not hinge upon the niceties of which party bore the burden of proof. The court observed that "there couldn't possibly be any way a reasonable trier of fact could conclude that [Anderson] was terminated for job performance" and that the incident with Karen Fields and the critical telephone call from Davis were insignificant, and were not treated as significant by Himes, until Paul Himes used them "to come up with some kind of cause" so he would not be "on the hook for this severance pay." No matter which party bore the risk of non-persuasion, the trial court's finding that Anderson was not terminated for cause or performance would have been the same.

## IV.

### *Legal Standard to Evaluate Himes's Decision to Terminate for Performance or Cause*

Further relying upon the *Conte* decision, Himes next argues that the trial court "ignored the legal standard enunciated in *Conte* and assumed the role of super personnel officer." As support, Himes quotes the following statement by the trial judge in his ruling from the bench:

And Himes had an opportunity to [specify what constituted cause or poor performance] in the contract they drew up, and unfortunately did not put any of that in there. So I don't know, maybe Mr. Himes'[s] idea is different than [Anderson's] idea, may be different from my idea of what cause is. It is just an open-ended term.

The trial judge's ruling, read in its entirety, makes plain that he did not substitute himself for Himes in the role of employer, by deciding whether Anderson's work actually was poor or whether his behavior in fact was cause for termination. Instead, consistent with the holding in *Conte,* the trial judge examined the motivations underlying Himes's decision to ter-

minate Anderson and assessed whether Paul Himes indeed terminated Anderson for the reasons he was citing as poor performance or cause. The trial judge found that Anderson was not terminated for the reasons Paul Himes and others testified about. Thus, the judge did not cast himself in the role of employer; rather, he decided as a matter of fact that the reasons cited by Paul Himes for terminating Anderson were not the reasons for which Anderson was terminated, and that, *post hoc*, Himes was feigning dissatisfaction with Anderson's work.

## V.

### *Error in Finding No Bona Fide Dispute under Maryland Wage Payment and Collection Law*

Lastly, Himes contends that the court erred in finding that there was no *bona fide* dispute as to whether severance pay was due to Anderson. Specifically,

> Anderson failed to establish by a preponderance of the evidence that [Himes] failed to act in good faith when it refused to pay Anderson his claimed severance. Thus, having failed to prove that there was no bona fide dispute ... the [c]ircuit [c]ourt's award of treble damages and attorneys' fees under [the MWPCL] was in error and should be reversed.

We defer to the factual findings of the trial court in the absence of clear factual error. *See Hoang v. Hewitt Ave. Associates, LLC,* 177 Md.App. 562, 576, 936 A.2d 915 (2007); *Mercy Med. Ctr., Inc. v. United Healthcare of the Mid-Atlantic, Inc.,* 149 Md.App. 336, 354–55, 815 A.2d 886, *cert. denied,* 374 Md. 583, 824 A.2d 59 (2003). "A factual finding is clearly erroneous if there is no competent and material evidence in the record to support it." *Hoang, supra,* (citing *YIVO Inst. for Jewish Research v. Zaleski,* 386 Md. 654, 663, 874 A.2d 411 (2005)).

■ Himes is correct in that the MWPCL permits an employee to recover up to three times the wage owed and

reasonable attorneys' fees and other costs only upon a finding that the employer failed to pay the money in violation of the MWPCL and "not as a result of a bona fide dispute. . . ." LE § 3–507(b). The Court of Appeals has read the MWPCL's *bona fide* dispute provision to require that, to recover treble damages and other costs, the employee present "sufficient evidence ... to permit a trier of fact to determine that [the employer] did not act in good faith when it refused to pay" the wages due. *Admiral Mortgage Inc. v. Cooper,* 357 Md. 533, 543, 745 A.2d 1026 (2000). In *Admiral Mortgage,* the Court of Appeals reversed the grant of summary judgment in favor of the employer in an MWPCL claim. The Court concluded that, on the summary judgment record, the employee had presented evidence that, if credited, tended to show that the employer did not believe in good faith that wages were not owed to the employee.

In the case at bar, Anderson adduced evidence at trial tending to show that Himes did not believe in good faith that the severance pay was not owed to Anderson. According to Anderson, Paul Himes told him he was being terminated because his position was being eliminated; but, when Anderson pointed out that he was entitled to severance pay under the Agreement, Mr. Himes responded that, if "that was in the [A]greement, then he would find cause for the termination."

The March 24, 2005 termination letter, which did not give a reason for Anderson's discharge, gave him one week's severance pay. According to the Himes Policy Manual, which was in evidence, a dismissed employee with three years of service, such as Anderson, is entitled to the benefit of one week's pay unless the employee left voluntarily or was "dismissed or released for cause." Paul Himes acknowledged that he did not realize, before terminating Anderson, that Anderson had an Agreement separate from the Himes Policy Manual that addressed severance pay. Thus, the termination letter given to Anderson represented Paul Himes's belief, prior to being told about the Agreement, that Anderson qualified for one

week's pay, *i.e.*, that he was not being dismissed or released for cause.

The evidence further showed that Paul Himes later tried to entice Anderson back into his job for two months to finish work on the Lockheed Martin Project, and that he did so because Lockheed Martin wanted Anderson to remain on the job. Additionally, Anderson was never informed of or reprimanded for the specific complaints of Karen Fields and James Davis regarding his allegedly brusque demeanor.

There was ample evidence adduced at trial to support the court's finding that all of the incidents that Himes put forth to justify Anderson's termination were "afterthoughts," *i.e.*, they were not the actual reasons why Anderson was terminated but were justifications cobbled together after the fact in an effort to avoid paying Anderson the severance money owed under the Agreement. That finding supported the trial court's ultimate finding that there was not a good faith dispute between the parties as to whether Anderson was owed three months' severance pay. Accordingly, the trial court's finding of an absence of a bonafide dispute was not clearly erroneous.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**